W.A. MONCRIEF, Jr., and, Charles B. Moncrief, Plaintiffs,

v.

UNITED STATES, Defendant.

No. 97–446L.

United States Court of Federal Claims.

March 16, 1999.

---

**73.** Nor has plaintiff explained why Mr. Laber's services were necessary in preparing his proposals.

James A. Bruton, III, Williams & Connolly, Washington, D.C., attorney of record for the plaintiff. William Pannill, Roy L. Barnes, Pannill, Moser & Barnes, L.L.P., Houston, TX, of counsel.

Ann D. Navaro, Environmental and Natural Resources Division, United States Department of Justice, Washington, D.C., with whom was Lois J. Schiffer, Assistant Attorney General, attorneys of record for the defendant. Geoffrey Heath, Lisa K. Hemmer, Office of the Solicitor, United States Department of the Interior, Washington, D.C., of counsel.

## *OPINION*

HORN, Judge.

The above-captioned case comes before the court on the defendant's motion for dismissal pursuant to Rules 12(b)(1) and 12(b)(4) of the Rules of the United States Court of Federal Claims (RCFC) for lack of subject matter jurisdiction and failure to state a claim upon which relief can be granted, respectively. The defendant, United States of America, acting through the United States Department of the Interior (DOI), alleges that plaintiffs, W.A. Moncrief, Jr. and Charles B. Moncrief, failed to exhaust required administrative remedies before bringing their present challenge in this court to a decision of the DOI. The DOI's decision assessed additional royalty fees against the plaintiffs related to their production of natural gas from federal lands which they leased from the government. The defendants also allege that plaintiffs' claim is time-barred by the ninety (90) day statute of limitations included in the Mineral Leasing Act (MLA). *See* 30 U.S.C. § 226–2 (1994). For these reasons, defendant contends that this court lacks subject matter jurisdiction to adjudicate plaintiffs' claims. In addition, defendant argues that the decisions relied upon by the plaintiffs are (1) not binding on this court and (2) unsupportive of the plaintiffs' arguments. Consequently, defendant also asserts that the Moncriefs have failed to state a claim upon which relief can be granted.

Plaintiffs, in turn, contend that the MLA does not require exhaustion of administrative remedies. Alternatively, plaintiffs argue that the DOI's decision in their case was not made inoperative pending review as required by the Supreme Court's decision in *Darby v. Cisneros,* 509 U.S. 137, 113 S.Ct. 2539, 125 L.Ed.2d 113 (1993), and, therefore, that plaintiffs are permitted to seek judicial review. Plaintiffs also argue that the statute of limitations in section 226–2 of the MLA is

inapplicable to their case because their claim to relief arises under the Federal Land Policy and Management Act of 1976 (FLPMA),[1] and because the limitations period in section 226–2 of the MLA only applies to disputes concerning the issuance of federal oil and gas leases.

## *FACTS*

The plaintiffs, W.A. Moncrief, Jr. and Charles B. Moncrief, are residents of Fort Worth, Texas, who own all or undivided portions of the lessee's interest under various oil and gas leases covering federal lands in Wyoming and New Mexico. The leases, issued by the DOI pursuant to the MLA, 30 U.S.C.A. §§ 181–287 (West 1994 & Supp. 1998), cover federal onshore and public domain lands, and are administered by the DOI's Minerals Management Service (MMS). The leases require the plaintiffs to pay as royalties a percentage of the gross proceeds which the plaintiffs receive for oil and gas produced from the leased lands. Specifically, lease royalty clauses require the Moncriefs to pay royalties based on a set percentage of the "amount or value of the production saved, removed, or sold."

Some of plaintiffs' claims in this case arise under leases covering federal lands in what is known as the Baldridge Canyon (Morrow) Field in Eddy County, New Mexico. In 1978, the Moncriefs signed a gas purchase contract with El Paso Natural Gas Company (El Paso) covering the gas which plaintiffs produced from that field. The contract obligated El Paso to pay the maximum lawful price,[2] and it also had a "take-or-pay" clause. Under the take-or-pay clause, the pipeline, in this case El Paso, agreed to take a specified percentage of the gas which a producer, in this case the plaintiffs, could deliver. If the pipeline could not or did not take the gas, it still had to pay for the contracted amount of gas.[3] The El Paso contract's take-or-pay

---

1. Codified at scattered sections of Title 43 of the United States Code.

2. According to an affidavit submitted by John W. Smith, plaintiffs' Manager of Gas Sales, this gas became price deregulated on January 1, 1985. For deregulated gas, the contract with El Paso

set a minimum price and included a price-escalation clause.

3. Citing 8 H. Williams & C. Meyers, *Oil & Gas Law* 1099 (Martin & Kramer ed.1996), plaintiffs state that take-or-pay clauses in gas contracts were a result of the intermittent demand for gas in the early years of the gas industry. Because

clause required El Paso to take or pay for eighty percent of the gas which the Moncriefs could deliver. The contract granted El Paso five years (from the year in which El Paso incurred a take deficiency) to recoup any make-up gas, which is gas for which the pipeline had previously paid, but never took. However, El Paso could take make-up volumes only after taking their required eighty percent of the gas produced at the Baldridge Canyon (Morrow) Field. The contract also gave El Paso the exclusive right to buy all of the gas produced from the field which the plaintiffs had not previously dedicated to other contracts.

Plaintiffs' other claims arise under leases covering lands in what are known as the Madden and Teepee Flats Fields in Fremont and Natrona Counties of Wyoming. In 1980, plaintiffs entered into a gas purchase contract which obligated the Michigan Wisconsin Pipe Line Company (later ANR Pipeline Company) to purchase gas produced from these fields. ANR agreed to pay the maximum lawful ceiling price for regulated gas under the Natural Gas Policy Act, 15 U.S.C. §§ 3301–3432 (1994), and to pay a set price (with an escalation clause) for deregulated gas. The contract also contained a take-or-pay clause requiring ANR either to take or to pay for eighty percent of the gas which plaintiffs could deliver. Like the El Paso contract, the ANR contract granted ANR the exclusive right to buy all the gas which the Moncriefs produced,[4] gave ANR five years to recoup any make-up gas, and limited ANR's make-up right to gas in excess of the eighty percent of plaintiffs' production which ANR was already obligated to take.

In the 1980s, during the course of plaintiffs' leases with the government and contracts with El Paso and ANR, the Federal Energy Regulatory Commission (FERC) set out to transform pipeline operators from natural gas merchants to common carriers of natural gas. Consequently, the FERC began requiring that pipelines transport gas for competing sellers, and it allowed pipeline customers to cancel their contracts with the pipelines. With many pipeline customers then switching to alternative fuels, and with the Natural Gas Policy Act deregulating most wellhead gas prices, market prices for a surplus of natural gas began to fall below the long-term contract prices which pipelines were still obligated to pay to producers.

Facing financial hardship due to the take-or-pay clauses, pipelines responded by breaching their contracts and simply refusing to take gas from the producers, although most pipelines and suppliers eventually resolved their contractual relationships through settlements. The court in *Independent Petroleum Ass'n of Am. v. Babbitt*, 92 F.3d 1248 (D.C.Cir.1996), described the common forms of these settlements:

> The take-or-pay settlements were of two types—"buydowns" and "buyouts." In a buydown, the pipeline pays a cash lump sum to the producer in exchange for contract amendments (or a new contract) providing for continued sale of the contracted-for gas at reduced prices. In a buyout, the pipeline pays a cash lump sum in exchange for release of the pipeline from the gas purchase contract. The producer is then free to sell the gas to someone else. Some contract settlements included both partial buydowns and partial buyouts. In some cases, the settlement payments (or portions thereof) could be recouped through future gas purchases in which the payments would be credited toward the purchase price of gas. Both types of contracts also often include a settlement of existing liability for previously incurred take-or-pay obligation.

*Id.* at 1252 (citations omitted).

In the present case, as the market price fell, El Paso cut takes of the Moncriefs' gas

---

producers cannot store natural gas on their premises, production cannot occur if the pipeline does not take the gas. By using take-or-pay clauses, producers were assured a steady cash flow because payments were made even when the pipeline had no market for the gas and no production took place.

4. According to the affidavit of John W. Smith, some of plaintiffs' gas was price deregulated, but no date is given. There was an exception for some gas which plaintiffs had already committed to other contracts.

from some 1670 Mcf[5] per day to 200 to 400 Mcf per day. As a result, El Paso accumulated a large and increasing take-or-pay liability to the plaintiffs, who sued El Paso for breach of contract in December of 1986. ANR also cut their gas take, from their original obligation of approximately 24,000 Mcf per day to approximately 1000 Mcf per day. Both El Paso and ANR amassed take-or-pay liabilities to the plaintiffs that the pipelines could not fully recoup due to the contract requirement that make-up gas be limited to any excess of the 80 percent of production which the pipelines were already obligated to take. In particular, ANR's take-or-pay liability increased at a rate of nearly $6 million per month, and plaintiffs sued ANR for breach of contract in the fall of 1987.

In 1988, plaintiffs and El Paso agreed to a settlement of their lawsuit whereby El Paso agreed to pay the Moncriefs $2,475,000.00 in a nonrecoupable sum and to extend the original contract term for an additional three-and-a-half years. In addition, for a reduction in its take-or-pay obligation[6] and a reduction in price to market price, El Paso allowed the Moncriefs to sell some gas from the Baldridge Canyon Morrow Field to third parties.

In 1989, the Moncriefs subsequently also settled their lawsuit with ANR. The terms of the settlement included a nonrecoupable payment from the pipeline to the plaintiffs of $80 million in three installments, plus $210,000.00 in additional proceeds for past gas sales under the contract (on which the Moncriefs had paid royalties) and $852,532.00 in interest. In addition, the end date of the contract was extended from 1995 to 1997, and the new contract price for gas was lowered to a level which was approximately double the existing market price in 1989. As in the El Paso settlement, ANR agreed to allow sale of some gas to third parties in return for a reduction in its take-or-pay obligation—in

this instance to 40 percent of the plaintiffs' possible production.

In 1993, four years after plaintiffs settled with ANR, the MMS announced a position on the subject of to what extent take-or-pay settlements constituted "gross proceeds" on which producers pay royalties. The MMS interpretation stated that "some or all of a settlement payment is or will become royalty bearing if production to which specific money is attributable occurs." Under this interpretation, royalties became due on settlement payments regardless of whether the payments were recoupable or nonrecoupable; the relevant question became whether the gas which was the subject of the original contracts was eventually sold.

The MMS applied this interpretation of "gross proceeds" when it audited the Moncriefs in 1994, and it assessed plaintiffs additional royalties based on their settlements with El Paso and ANR. Regarding the El Paso settlement, John W. Smith, the Manager of Gas Sales for the Moncriefs, discussed the royalties with Bill Arneson of the Dallas Compliance Office of the MMS. Based on their conversations, the MMS determined that plaintiffs owed royalties of $2599.00 on the El Paso settlement. Plaintiffs paid the $2599.00 sum in January of 1995, as well as $1963.00 in interest later demanded by the MMS in March of that year.

For the ANR settlement, Gary L. Johnson, the Division Chief of the MMS Dallas Compliance Division, sent an "issue letter" to plaintiff W.A. Moncrief on March 8, 1995. The letter notified Moncrief of the MMS auditors' preliminary determination that additional royalties were due on the payments received from ANR, and it invited comment or documentation to refute or change the determination. In pertinent part, the letter read as follows:

The Minerals Management Service (MMS), Dallas Compliance Division, has reviewed the contract settlement agreement (Settle-

---

5. An "Mcf" is equal to one thousand cubic feet, and is a standard unit of measurement in the natural gas industry.

6. It is unclear to what percentage this obligation was lowered. Plaintiffs state in their brief that

El Paso's take-or-pay requirement was lowered to 40 percent, while the Moncrief's Manager of Gas Sales, John W. Smith, states in his affidavit that the requirement was lowered to 60 percent.

ment) between W.A. Moncrief, Jr. (Moncrief), and ANR Pipeline Company (ANR) dated May 25, 1989. The review was performed to determine whether royalties are due on Settlement proceeds associated with Federal and/or Indian leases. This letter is intended to apprise you of a preliminary royalty underpayment determination resulting from our review and does not constitute a final action by MMS. Its purpose is to give you an opportunity to comment or provide additional documentation that would refute or alter our preliminary determination.

Our review indicates that Moncrief entered into [a gas purchase contract] with Michigan Wisconsin Pipe Line Company (predecessor to ANR) referred to as the Wyoming contract.... Dated April 15, 1980, the Wyoming contract covered production from numerous Federal leases in Fremont and Natrona Counties, Wyoming.... In 1987 Moncrief initiated litigation to settle past take-or-pay claims and other disputes arising from the Wyoming contract. On May 25, 1989, Moncrief and ANR executed the Settlement to resolve all disputes and halt the litigation.

The Settlement provided that ANR would pay Moncrief $65 million upon execution, $210,000 prior to June 30, 1989, and $15,852,534.25 including interest on January 2, 1990. In return, Moncrief would amend the Wyoming contract ... and sign agreements regarding future royalties, deliveries, and takes. The amended Wyoming contract reduced the pricing provisions ("buydown") and the minimum take requirements ("buyout") of the original contract.

ANR's $210,000 Settlement payment related to accounting disputes and underpayments prior to June 1, 1989, involving wells covered by the Wyoming contract. Moncrief contends that the remaining $80,852,534.25 Settlement payment satisfied Moncrief's claim for past take-or-pay deficiencies. The MMS rejects this allocation. Based on information provided by Moncrief, MMS has determined that the full economic value of the past take-or-pay claim was $191,705,551 on a volume of 19,489,836 Mcf. For take-or-pay claims,

MMS' experience indicates that settlement payments usually reflect approximately 15 percent of the accrued take-or-pay liability. Therefore, the portion of the Settlement proceeds allocable to take-or-pay would be $29 million (rounded). The remaining $51,852,534.25 would be allocated to "buydown" and "buyout".

\* \* \* \* \* \*

It is MMS' position that when a purchaser compensates the lessee for lower prices to be received on future production, the compensation is additional gross proceeds when the production occurs. Before the Settlement, Moncrief had a contractual right to collect a higher price for its production than what it ultimately received. Moncrief's release of ANR from its contractual obligations under the original contracts resulted in the receipt of the $51,852,534.25.

It is well established that the lessee is obligated to market production for the mutual benefit of both itself and the lessor. When Moncrief, as lessee, agreed to market future production at less than the original contractual price, it gave up a valuable right of the lessor. When the lessee is compensated for such a concession of mutual rights, the lessor is entitled to its fair share of the compensation. Therefore, when Moncrief, as lessee, received the $51,852,534.25 as compensation to "buydown"/"buyout" contract terms related to gas ultimately produced from Federal leases, MMS, the royalty owner, was entitled to its fractional share of the compensation.

\* \* \* \* \* \*

It is MMS' policy that payments received under contract settlement agreements are royalty bearing if the mineral to which the payment is attributable is produced and sold either to the *original purchaser or a substitute purchaser*. The settlement proceeds received from the "buydown"/"buyout" portion of the Settlement that was directly attributable to production from the Federal lease is royalty bearing.

\* \* \* \* \* \*

Moncrief's failure to properly allocate the settlement payments between past pricing, take-or-pay, "buydown" and "buyout" and to calculate the associated royalties ... has resulted in apparent underpayments of royalties on Federal leases.

This letter is to advise you of a potential underpayment of royalties and should not be interpreted to be an official order to pay. However, if an official response addressing the findings is not received within 30 days from receipt of this letter, an official order may be issued by MMS....

(emphasis in original).

After the plaintiffs received the letter, their representative Mr. Smith had several conversations with Mr. Arneson and Mr. Johnson of the MMS Dallas Compliance Office regarding how to apply the MMS instructions. As a result of those discussions, MMS determined that plaintiffs owed royalties of $1,711,788.00 on the settlement sums which they received from ANR. According to the plaintiffs, that royalty total included (1) additional royalties on gas which the Moncriefs sold to third parties after the gas was released from the coverage of the original ANR contract, and (2) additional royalties on gas which the Moncriefs sold to ANR during the original remaining term of the contract. On June 30, 1995, plaintiffs paid the $1,711,-788.00 royalty sum to the Government, allegedly under protest.

A year later, the Court of Appeals for the District of Columbia Circuit issued a decision in *Independent Petroleum Ass'n of Am. v. Babbitt*, 92 F.3d 1248 (D.C.Cir.1996). Plaintiffs construe that court's holding as stating that when a take-or-pay payment or a contract settlement payment is nonrecoupable, those payments are not tied to actual gas production and a producer owes no royalty on the payment. Plaintiffs allege that in light of *Independent Petroleum Ass'n of Am. v. Babbitt*, the MMS's position on "gross proceeds," as it was applied to plaintiffs' settlements, is arbitrary and capricious. On the strength of the ruling by the Court of Appeals for the District of Columbia Circuit, and the government's decision to forego an appeal of that case, the Moncriefs filed suit in this court under section 1734(c) of the Feder-

al Land Policy and Management Act of 1976, seeking a refund of the additional royalties which they had paid on their take-or-pay settlements.

The government responded by filing a motion to dismiss for lack of subject matter jurisdiction and failure to state a claim upon which relief can be granted. Defendant asserts that subject matter jurisdiction is lacking because:

The terms of the Mineral Leasing Act ("MLA"), 30 U.S.C. § 181, *et seq.*, and the applicable regulations pursuant to which the federal leases were issued bar Plaintiffs' claim. Plaintiff[s] did not pursue any available administrative appeals and cannot now contest the assessments. Further, even if Plaintiffs could otherwise challenge an order they did not appeal, the MLA establishes a strict ninety day statute of limitations for challenges to decisions under the [MLA].

In addition, defendant contends that the Moncriefs have failed to state a claim upon which relief can be granted because the decision in *Independent Petroleum Ass'n of Am. v. Babbitt*, on which plaintiffs rely, is not controlling in this Circuit and is based on facts "sufficiently different from those described in Plaintiffs' Complaint so as to make it inapplicable."

### *DISCUSSION*

The defendant has filed a motion to dismiss pursuant to RCFC 12(b)(1) for lack of subject matter jurisdiction and RCFC 12(b)(4) for failure to state a claim upon which relief can be granted. When considering a motion to dismiss, the court may consider all relevant evidence in order to resolve any disputes as to the truth of the jurisdictional facts alleged in the complaint. *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed.Cir.1988). The court is required to decide any disputed facts which are relevant to the issue of jurisdiction. *Id.*

The standard for weighing the evidence presented by the parties when evaluating a motion to dismiss for lack of jurisdiction has been articulated by the United States Supreme Court, as follows: "in passing on a motion to dismiss, whether on the ground of

lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *accord Hamlet v. United States,* 873 F.2d 1414, 1416 (Fed.Cir.1989); *see also Alaska v. United States,* 32 Fed.Cl. 689, 695 (1995), *appeal dismissed,* 86 F.3d 1178 (Fed.Cir.1996). In rendering a decision, the court must presume that the undisputed factual allegations included in the complaint by a plaintiff are true. *Miree v. DeKalb County,* 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977); *Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d at 746; *Alaska v. United States,* 32 Fed.Cl. at 695.

The burden of establishing jurisdiction is on the plaintiff. *McNutt v. General Motors Acceptance Corp. of Indiana,* 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936); *Alaska v. United States,* 32 Fed.Cl. at 695; *Catellus Dev. Corp. v. United States,* 31 Fed.Cl. 399, 404 (1994). The court should not grant a motion to dismiss "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (footnote omitted). Nonetheless, "conclusory allegations unsupported by any factual assertions will not withstand a motion to dismiss." *Briscoe v. LaHue,* 663 F.2d 713, 723 (7th Cir.1981), *aff'd,* 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983).

In order for this court to have jurisdiction over plaintiff's complaint, the Tucker Act, as amended, 28 U.S.C.A. § 1491 (West 1994 & Supp.1998), requires that a substantive right, which is enforceable against the United States for money damages, must exist independent of 28 U.S.C. § 1491. The Tucker Act provides:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1). The Tucker Act merely confers jurisdiction on the United States Court of Federal Claims; it does not create a substantive right that is enforceable against the United States for money damages. *United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607, *reh'g denied,* 446 U.S. 992, 100 S.Ct. 2979, 64 L.Ed.2d 849 (1980); *United States v. Testan,* 424 U.S. 392, 398–99, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976); *United States v. Connolly,* 716 F.2d 882, 885 (Fed.Cir.1983) (en banc), *cert. denied,* 465 U.S. 1065, 104 S.Ct. 1414, 79 L.Ed.2d 740 (1984).

Moreover, a waiver of the traditional sovereign immunity "cannot be implied but must be unequivocally expressed." *United States v. King,* 395 U.S. 1, 4, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969) (citing *United States v. Sherwood,* 312 U.S. 584, 61 S.Ct. 767, 85 L.Ed. 1058 (1941)). The individual claimants, therefore, must look beyond the jurisdictional statute for a waiver of sovereign immunity. *United States v. Testan,* 424 U.S. at 398, 96 S.Ct. 948. "[I]n order for a claim against the United States founded on statute or regulation to be successful, the provisions relied upon must contain language which could fairly be interpreted as mandating recovery of compensation from the government." *Cummings v. United States,* 17 Cl.Ct. 475, 479 (1989), *aff'd,* 904 F.2d 45 (Fed.Cir.1990) (citations omitted); *see also United States v. Mitchell,* 463 U.S. 206, 216–17, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983) (citing *United States v. Testan,* 424 U.S. at 400, 96 S.Ct. 948 (quoting *Eastport Steamship Corp. v. United States,* 178 Ct.Cl. 599, 607, 372 F.2d 1002, 1009 (1967))); *Duncan v. United States,* 229 Ct.Cl. 120, 138, 667 F.2d 36, 47 (1981), *cert. denied,* 463 U.S. 1228, 103 S.Ct. 3569, 77 L.Ed.2d 1410 (1983).

### I. Exhaustion of administrative remedies

The defendant first contends that this court lacks jurisdiction to adjudicate plaintiffs' claims because the plaintiffs failed to exhaust administrative remedies provided for in DOI regulations. The government states that "[b]ecause it is far too late to take up a

dispute with the agency on a matter on which the Plaintiffs wanted to resolve by cooperation rather than litigation, [the Moncriefs] are hoping to escape their administrative obligations by seeking a refund in this court."

 "The doctrine of exhaustion of administrative remedies is one among related doctrines—including abstention, finality, and ripeness—that govern the timing of federal-court decisionmaking." *McCarthy v. Madigan*, 503 U.S. 140, 144, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992). The doctrine is well established in the jurisprudence of administrative law, *McKart v. United States*, 395 U.S. 185, 193, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969), and provides "that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." *Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 50–51, 58 S.Ct. 459, 82 L.Ed. 638 (1938); *accord Sandvik Steel Co. v. United States*, 164 F.3d 596, 599 (Fed.Cir.1998); *Burlington N.R.R. Co. v. United States*, 752 F.2d 627, 629 (Fed.Cir.1985). Exhaustion is required to serve the purposes of protecting administrative agency authority and promoting judicial efficiency. *See McCarthy v. Madigan*, 503 U.S. at 145, 112 S.Ct. 1081.

 Regarding the first purpose of protection of agency authority, "the exhaustion doctrine recognizes the notion, ground in deference to Congress' delegation of authority to coordinate branches of Government, that agencies, not the courts, ought to have primary responsibility for the programs that Congress has charged them to administer." *Id.* Therefore, it is desirable to avoid premature interruption of the administrative process. *McKart v. United States*, 395 U.S. at 193, 89 S.Ct. 1657. As the Supreme Court has stated:

> The agency, like a trial court, is created for the purpose of applying a statute in the first instance. Accordingly, it is normally desirable to let the agency develop the necessary factual background upon which decisions should be based. And since agency decisions are frequently of a discretionary nature or frequently require expertise, the agency should be given the first chance to exercise that discretion or to apply that expertise. And of course it is generally more efficient for the administrative process to go forward without interruption than it is to permit the parties to seek aid from the court at various intermediate stages.

*Id.* at 193–94, 89 S.Ct. 1657. In addition, notions of administrative autonomy dictate that an agency should be given the opportunity to correct its own mistakes with respect to the programs it administers before being brought into court. *McCarthy v. Madigan*, 503 U.S. at 145, 112 S.Ct. 1081. An agency's effectiveness may also be weakened if people are encouraged to ignore its procedures by the allowance of "frequent and deliberate flouting of administrative processes." *McKart v. United States*, 395 U.S. at 195, 89 S.Ct. 1657.

As to the promotion of judicial efficiency, a dispute may be mooted, or at least piecemeal appeals may be avoided, if an agency has the chance to correct its own errors. *McCarthy v. Madigan*, 503 U.S. at 145, 112 S.Ct. 1081. Plus, the full course of the administrative process "may produce a useful record for subsequent judicial consideration, especially in a complex or technical factual context." *Id.*

 Congressional intent is of "paramount importance in the exhaustion context because Congress is vested with the power to prescribe the basic procedural scheme under which claims may be heard in federal courts." *Patsy v. Board of Regents of Florida*, 457 U.S. 496, 501, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982). "Where Congress specifically mandates, exhaustion is required." *McCarthy v. Madigan*, 503 U.S. at 144, 112 S.Ct. 1081 (citing *Coit Independence Joint Venture v. FSLIC*, 489 U.S. 561, 579, 109 S.Ct. 1361, 103 L.Ed.2d 602 (1989); *Patsy v. Board of Regents of Florida*, 457 U.S. at 502 n. 4, 102 S.Ct. 2557). Nevertheless, when Congress has not clearly required exhaustion, courts should be guided by congressional intent in determining whether application of the doctrine would be consistent with the statutory scheme. *Patsy v. Board of Regents of Florida*, 457 U.S. at 502 n. 4, 102 S.Ct. 2557. To determine whether exhaustion should be re-

quired in such a situation, "courts generally focus on the role Congress has assigned to the relevant federal agency, and tailor the exhaustion rule to fit the particular administrative scheme created by Congress." *Id.*

■ "In determining whether exhaustion is required, federal courts must balance the interest of the individual in retaining prompt access to a federal judicial forum against countervailing institutional interests favoring exhaustion." *McCarthy v. Madigan,* 503 U.S. at 146, 112 S.Ct. 1081. In *McCarthy v. Madigan,* the Supreme Court recognized that there are at least three scenarios in which the interests of the individual weigh heavily against requiring administrative exhaustion. *See id.* at 146–49, 112 S.Ct. 1081. The first situation is when requiring resort to the administrative remedy might cause undue prejudice to subsequent assertion of a court action, such as when there is an indefinite time period for agency action or when the plaintiff needs immediate consideration of a claim. *Id.* at 146–47, 112 S.Ct. 1081. Second, exhaustion may not be required if the administrative remedy could be inadequate "because of some doubt as to whether the agency [is] empowered to grant effective relief." *Id.* at 147, 112 S.Ct. 1081 (quoting *Gibson v. Berryhill,* 411 U.S. 564, 575 n. 14, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973)). This might occur when the agency lacks institutional competence to resolve the dispute, for example when the issue centers on the constitutionality of a statute. *Id.* Last, "an administrative remedy may be inadequate where the administrative body is shown to be biased or has otherwise predetermined the issue before it." *Id.* (citing *Gibson v. Berryhill,* 411 U.S. at 575 n. 14, 93 S.Ct. 1689).

■ Mindful of these principles, a court must first determine whether exhaustion of administrative remedies is required by the applicable statutes and regulations governing plaintiffs' claim. Defendant contends that the DOI's leasing regulations "require that the agency first adjudicate finally all royalty valuation issues before a lessee may seek judicial review." *See* 30 C.F.R. § 243.3 (1995); 30 C.F.R. § 290.3 (1995); 43 C.F.R. § 4.21 (1995). It is the plaintiffs' belief, however, that the regulations merely state how a petitioner can exhaust its administrative remedies, and the regulations do not require exhaustion before judicial review.

The Moncriefs argue that exhaustion was not necessary since it is not expressly required by the statute upon which they base their claim, namely, section 1734(c) [7] of the FLPMA. Section 1734(c) reads as follows:

In any case where it shall appear to the satisfaction of the Secretary that any person has made a payment under any statute relating to the sale, lease, use, or other disposition of public lands which is not required or is in excess of the amount required by applicable law and the regulations issued by the Secretary, the Secretary, upon application or otherwise, may cause a refund to be made from applicable funds.

43 U.S.C. § 1734(c). While the above quoted provision ensures that the Secretary of the Interior must pay any refunds owed, the statute also requires that the refund claim be evaluated for quantum upon consideration of the "applicable law and the regulations issued by the Secretary." The applicable law in this case is the Mineral Leasing Act and regulations issued pursuant thereto, because the plaintiffs' federal oil and gas leases were issued by the DOI under the authority of that Act.[8] Thus, the MLA's requirements are incorporated into the leases at issue. The court, therefore, must turn to the MLA and the corresponding DOI regulations to determine whether exhaustion of remedies is required in this case.

Moreover, section 701 of the Administrative Procedure Act (APA), 5 U.S.C. § 701(a) (1994), states that "[t]his chapter [§§ 701–06] applies, according to the provisions thereof, except to the extent that—(1) statutes pre-

---

7. 43 U.S.C. § 1734(c) (1994).

8. Plaintiffs' Complaint in this case, at paragraph 5, agrees that the relevant leases in this case were issued by the Department of the Interior pursuant to the Mineral Leasing Act. *See also* 30 U.S.C. § 226(a), noting the "Authority of Secretary" as follows: "All lands subject to disposition under this chapter which are known or believed to contain oil or gas deposits may be leased by the Secretary."

clude judicial review; or (2) agency action is committed to agency discretion by law." Section 702 provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action *within the meaning of a relevant statute,* is entitled to judicial review thereof." Although § 702 sets forth the general right to judicial review of agency actions under the APA, § 704 establishes when such review is available. *Darby v. Cisneros,* 509 U.S. 137, 146, 113 S.Ct. 2539, 125 L.Ed.2d 113 (1993). Section 704 of the APA states:

Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action. Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority.

5 U.S.C. § 704. Thus, "[w]hen an aggrieved party has exhausted all administrative remedies expressly prescribed by statute or agency rule, the agency action is 'final for the purposes of this section' and therefore 'subject to judicial review' under the first sentence." *Darby v. Cisneros,* 509 U.S. at 146, 113 S.Ct. 2539.

Defendant contends that administrative remedies were required by the DOI's regulations and that the plaintiffs chose not to employ those remedies. Defendant states that "[p]laintiffs did not appeal the royalty assessments to the MMS Director. Nor did they appeal to the Interior Board of Land Appeals. They simply paid the assessments and did not dispute them. It follows that this action is not cognizable in this or any other court."

The government also points to DOI regulatory language entitled "Exhaustion of administrative remedies," which states:

In order to exhaust administrative remedies, a decision or order of MMS' Royalty Management Program *must be appealed* pursuant to 30 CFR part 290 to the Director (or the Deputy Commissioner of Indian Affairs when Indian lands are involved), and subsequently to the Interior Board of Land Appeals under 30 CFR part 290.7 and 43 CFR part 4 unless the order has been made effective by the Director, or by the Assistant Secretary for Land and Minerals Management, or by the Assistant Secretary for Indian Affairs, or by the Interior Board of Land Appeals pursuant to 43 CFR part 4, as applicable.

30 C.F.R. § 243.3 (emphasis added). Furthermore, 43 C.F.R. § 4.21(c) also guides the appeals process. That regulation states:

(c) *Exhaustion of administrative remedies.* No decision which at the time of its rendition is subject to appeal to the Director or an Appeals Board shall be considered final so as to be agency action subject to judicial review under 5 U.S.C. 704, unless a petition for a stay of decision has been timely filed and the decision being appealed has been made effective in the manner provided in paragraphs (a)(3) or (b)(4) of this section or a decision has been made effective pending appeal pursuant to paragraph (a)(1) of this section or pursuant to other pertinent regulation.

Defendant, therefore, argues that the applicable statutes and regulations required the Moncriefs to present any challenge to a DOI decision first through DOI administrative channels. The court agrees that the plaintiffs were required to exhaust required administrative remedies. Such remedies were expressly prescribed by agency rules, and the Moncriefs elected not to utilize them. Had the Moncriefs wanted to challenge the MMS's assessment of royalties on the ANR settlement, they were required to file an official response within thirty days of receiving the preliminary determination. If the MMS subsequently held fast to its initial decision, DOI then would have issued an official order which the plaintiffs could have appealed, pursuant to 30 C.F.R. part 290, titled "Appeals Procedures," to the Director of the MMS. In addition, 30 C.F.R. § 290.3

necessitates that plaintiffs would have had to file their appeal to the Director within "thirty days from service of the order or decision." The Director's decision would have been appealable to the Interior Board of Land Appeals (IBLA) under 30 C.F.R. § 290.7 [9] and 43 C.F.R. part 4. Finally, an adverse decision by the IBLA would have been the final agency action under 43 C.F.R. 4.21(d),[10] which would have been subject to judicial review. These regulations, read in conjunction with the above-quoted "exhaustion of administrative remedies" provisions of 43 C.F.R. § 4.21(c) and 30 C.F.R. § 243.3, establish a review process which the Moncriefs were obligated to follow.[11]

Rather than filing a response or challenge to the preliminary determinations by the MMS, the Moncriefs voluntarily chose to have their representative discuss the issues presented with officials in the Dallas Compliance Office of the MMS. For the settlement with El Paso, the MMS never even sent a preliminary determination letter. Following the MMS audit of the Moncriefs, and based on conversations between Bill Arneson of the MMS and plaintiffs' representative, John Smith, the MMS determined that plaintiffs owed royalties of $2599.00 on the El Paso settlement. Plaintiffs paid the $2599.00 sum in January of 1995, as well as $1963.00 in interest later demanded by the MMS in March of that year prior to the issuance of an agency determination.

For the settlement with ANR, the letter which MMS sent to plaintiffs specifically informed them that it was a "preliminary royalty underpayment determination" which "[did] not constitute a final action by MMS." The purpose of the letter was to give the plaintiffs "an opportunity to comment or provide additional documentation that would refute or alter [the] preliminary determination." Near its conclusion, the letter emphasized again that

> [t]his letter is to advise you of a potential underpayment of royalties and should not be interpreted to be an official order to pay. However, if an official response addressing the findings is not received within 30 days from receipt of this letter, an official order may be issued by MMS.

In June of 1995, after several conversations with MMS officials, plaintiffs paid the $1,711,788.00 in additional royalty fees requested for the ANR settlement, and did not

9. 30 C.F.R. § 290.7 (1995) reads:

§ 290.7 Appeals to the Board of Land Appeals. Any party to a case adversely affected by a final decision of the Director, Minerals Management Service, or the Commissioner of Indian Affairs under this part shall have a right of appeal to the Board of Land Appeals in the Office of Hearings and Appeals, Office of the Secretary, in accordance with the procedures provided in 43 CFR Part 4, "Department Hearings and Appeals Procedures."

10. The text of 43 C.F.R. § 4.21(d) (1995) states:

(d) *Finality of decision.* No further appeal will lie in the Department from a decision of the Director or an Appeals Board of the Office of Hearings and Appeals. Unless otherwise provided by regulation, reconsideration of a decision may be granted only in extraordinary circumstances where, in the judgment of the Director or an Appeals Board, sufficient reason appears therefor. Requests for reconsideration must be filed promptly, or within the time required by the regulations relating to the particular type of proceeding concerned, and must state with particularity the error claimed. The filing and pendency of a request for reconsideration shall not operate to stay the effectiveness of the decision involved unless so ordered by the Director or an Appeals Board. A request for reconsideration need not be filed to exhaust administrative remedies.

11. *See OXY USA Inc. v. Babbitt,* No. 96–C–1067–K, 1997 WL 910381, at *1 (N.D.Okla. Sept. 23, 1997) ("Under the Administrative Procedure Act ('APA'), final agency action is a prerequisite to judicial review. 5 U.S.C. § 704. The MMS regulations also require that a lessee exhaust its administrative remedies prior to seeking judicial review. 30 C.F.R. § 243.3."); *Marathon Oil Co. v. Babbitt,* Civ. A. No. 94–N–1429, 1996 WL 640436, at *11 (D.Colo. Aug. 29, 1996) ("When a royalty dispute materializes, and the MMS issues a lessee an administrative order to pay ..., the lessee must appeal to the MMS Director, and then to either the Interior Board of Land Appeals ('IBLA'), the Assistant Secretary for Land and Minerals Management, or the Assistant Secretary for Indian Affairs. *See* 30 C.F.R. § 290 (1995). The decision of an Assistant Secretary or the IBLA is a final agency action subject to judicial review. *See* 5 U.S.C.A. § 704 (West 1996); 43 C.F.R. § 4.403 (1995). Accordingly, a lessee's exhaustion of administrative remedies is mandatory. *See* 30 C.F.R. § 243.3 (1995)."), *appeal dismissed and remanded on other grounds,* 133 F.3d 932 (10th Cir.1998).

force the MMS to issue an official order.[12]

The plaintiffs do not claim that they formally contested the decisions of the MMS concerning the ANR and El Paso settlements. By not officially responding to the preliminary determination in the ANR case which they did receive, the Moncriefs never forced the MMS to issue an official order. Certainly, no appeals to the Director were filed within thirty days of the El Paso and ANR payments, as would have been required by 30 C.F.R. § 290.3.[13] The court concludes that plaintiffs failed to exhaust the required administrative remedies, which is a predicate to judicial action.

Alternatively, plaintiffs also argue that they should not have been required to exhaust administrative remedies because the DOI regulations do not render an MMS action "inoperative" pending administrative review. Plaintiffs' contention is based on the requirement of 30 C.F.R. § 243.2(a) that "suspension of an order or decision requiring the payment of a specified amount of money shall be contingent upon the appellant's submission ... of an MMS-specified surety instrument deemed adequate to indemnify the lessor from loss or damage."

 As support for their position, plaintiffs point to the Supreme Court's holding in *Darby v. Cisneros* that "where the APA applies, an appeal to 'superior agency authority' is a prerequisite to judicial review *only* when expressly required by statute or when an agency rule requires appeal before review and the administrative action is made inoperative pending that review." 509 U.S. at 154, 113 S.Ct. 2539 (emphasis in original). However, requiring a surety instrument as a litigation prerequisite can be considered an expense of litigation. *See OXY USA, Inc. v. Babbitt*, 1997 WL 910381, at *2. Other federal courts have found, and this court agrees, that ordinary litigation expenses which accompany administrative relief do not excuse plaintiffs from the requirement to exhaust administrative remedies, no matter how substantial and nonrecoverable are the expenses.[14] *See, e.g., Ukiah Valley Med. Ctr. v. Federal Trade Comm'n*, 911 F.2d 261, 264 (9th Cir.1990) (citing *State of California ex rel. Christensen v. Federal Trade Comm'n*, 549 F.2d 1321, 1323 (9th Cir.), *cert. denied*, 434 U.S. 876, 98 S.Ct. 228, 54 L.Ed.2d 156 (1977)); *St. Regis Paper Co. v. Marshall*, 591 F.2d 612, 614 (10th Cir.), *cert. denied*, 444 U.S. 828, 100 S.Ct. 55, 62 L.Ed.2d 36 (1979); *OXY USA, Inc. v. Babbitt*, 1997 WL 910381, at *2.

 Since the time when plaintiffs' paid the additional royalty fees levied against them by the MMS, decisions have issued which have resulted in the refund of royalties assessed against other producers like themselves. Thus, plaintiffs now argue that they have been wronged by the MMS. But, allowing the Moncriefs to bring their claim for repayment of the additional royalties already

---

**12.** Plaintiffs allege that the payment of additional royalties was made "under protest." The court notes that the record currently provides no corroborating evidence for this allegation. Even if true, the DOI regulations pertinent to plaintiffs' claim do not dictate that making payment "under protest" would have legal significance in the absence of appeals to the Director and the IBLA. Moreover, as defendant notes in its reply brief, the plaintiffs are familiar with the appeals process. According to the defendant, W.A. Moncrief or W.A. Moncrief, Jr. has been the named appellant in at least thirteen administrative appeals from MMS orders since 1983.

**13.** Defendant notes that "some lessees choose to pay pending appeal for internal accounting reasons, or in order to avoid the running of interest." *See, e.g., Black Butte Coal Co. v. United States*, 27 Fed.Cl. 699, *vacated as moot on joint motion*, 14 F.3d 612 (Fed.Cir.1993) (company followed appeals process to final adverse IBLA decision, then company paid, following which it sought review in the Court of Federal Claims).

**14.** The rationale behind requiring an agency action to be inoperative during appeal is that, otherwise, judicial intervention might become necessary before exhaustion to prevent a plaintiff from suffering irreparable harm. *See Renegotiation Board v. Bannercraft Clothing Co., Inc.*, 415 U.S. 1, 24, 94 S.Ct. 1028, 39 L.Ed.2d 123 (1974). The Supreme Court has declared that "[m]ere litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury." *Id.* (citing *Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 51–52, 58 S.Ct. 459, 82 L.Ed. 638 (1938)). Even without this clear directive from the Supreme Court, it is difficult to see how plaintiffs would have suffered any irreparable injury from posting a surety when they voluntarily elected to pay the entire sum of additional royalties requested by the MMS.

paid, at this late date, and after the plaintiffs voluntarily resolved their dispute with the MMS, would run contrary to the purposes of the exhaustion of remedies doctrine. It would also undermine the notion of the finality of voluntary payment and settlement of monetary disputes between parties, whether involving the sovereign or between private parties.

The Department of the Interior has "plenary authority over the administration of public lands, including mineral lands; and it has been given broad authority to issue regulations concerning them." *Best v. Humboldt Placer Mining Co.,* 371 U.S. 334, 83 S.Ct. 379, 382, 9 L.Ed.2d 350 (1963). This authority includes the administration of oil and gas leases on federal lands. *See* 30 U.S.C. § 226(a). Pursuant to its powers, the DOI has developed a comprehensive and orderly scheme for decision-making and consideration of appeals of those decisions. There is nothing unique about plaintiffs' situation which should allow them to bypass the DOI review process or to gain reconsideration several years after the close of a case or a dispute. By allowing judicial review of a claim not fully and properly pursued through agency channels, the court would undermine the agency's authority and indicate to other claimants that exhaustion of administrative remedies is optional and that a final resolution of a matter before the agency is subject to reconsideration years later.

II. Mineral Leasing Act statute of limitations

■ The defendant has also moved to dismiss this case based on the alleged expiration of the applicable MLA statute of limitations. 30 U.S.C. § 226-2 states that "[n]o action contesting a decision of the Secretary involving any oil and gas lease shall be maintained unless such action is commenced or taken within ninety days after the final decision of the Secretary relating to such matter."

In January, March and June of 1995, plaintiffs remitted to the MMS the additional royalties which the DOI requested for the El Paso and ANR settlements. Plaintiffs made no formal attempt to contest the validity of these payments until filing suit in this court on June 30, 1997. While the MMS issued no final orders to pay the royalties due for either settlement, plaintiffs have not alleged the absence of a "final decision" within the scope of section 226-2. Nor have plaintiffs alleged that the limitations period would be unexpired were the court to decide that section 226-2 applies to this case. Instead, plaintiffs claim that "the legislative history restricts the 90-day statute of limitations to grants of leases," and that "courts have limited section 226-2 to actions either to contest the grant of a lease or to contest substantive decisions relating to the lease itself."

In support of the first contention, the Moncriefs quote the Senate Report accompanying the legislation as stating that section 226-2 is:

> A statute of limitations providing that any action under the Administrative Procedure Act to review a decision of the Secretary involving an oil and gas lease must be initiated within 90 days after the final decision of the Secretary.... Such a provision will remove a potential cloud on acreage subject to leasing.

S.Rep. No. 86-1549, *reprinted in* 1960 U.S.C.C.A.N. 3313, 3317. Plaintiffs then quote the DOI's understanding of section 226-2 as indicated in the legislative history:

> The new section ... prohibiting any action under the Administrative Procedure Act for a review of a secretarial decision on an oil and gas lease unless the action is commenced within 90 days of the Secretary's final decision is highly desirable. We approve of this section and believe it would prove helpful both to us and to other parties interested in obtaining oil and gas leases.

*Id., reprinted in* 1960 U.S.C.C.A.N. 3313, 3334 (letter of Under Secretary of the Interior, Elmer F. Bennett, dated May 11, 1960).

While the plaintiffs may believe otherwise, these statements from the legislative history do not limit application of the MLA statute of limitations just to contests regarding the issuance of leases. At most, as defendant argues, the "history merely indicates that at the time of enactment, particular concern

focused on leasing issues." The statutory language of section 226–2 requires only that the action be one "contesting a decision of the Secretary involving any oil and gas lease.... " There is no definition in the MLA restricting the word "decision" to exclude disputes regarding the amount of royalty payments due to the DOI from a lessee under a lease. Further, the Conference Report concerning the passage of section 226–2 states that the statute of limitations is "applicable to actions contesting decisions of the Secretary of the Interior under the Mineral Leasing Act." H.R. Conf. Rep. No. 86–2135, *reprinted in*, 1960 U.S.C.C.A.N. 3335, 3337. Disputes over royalties due from a lessee as assessed by the DOI would seem to fit squarely within the parameters of 30 U.S.C. § 226–2.

Plaintiffs also try to argue that 30 U.S.C. § 226–2 does not apply to their case because it does not concern a lease grant or the validity of a lease. They cite *Aulston v. United States*, 915 F.2d 584 (10th Cir.1990), *cert. denied*, 500 U.S. 916, 111 S.Ct. 2011, 114 L.Ed.2d 98 (1991), for the statement that "[the MLA statute of limitations] does not apply to actions under the FLPMA, but rather to the validity of lease permits issued pursuant to the [MLA]." *Id.* at 588 n. 4.[PR20] Immediately following the text quoted by the plaintiffs in *Aulston*, however, the court also cited one of its prior cases as holding that "30 U.S.C. § 226–2 applies to actions contesting agency decisions made under the [MLA]." *Id.* (citing *Park County Resource Council v. United States Dep't of Agric.*, 817 F.2d 609, 616 (10th Cir.1987), *overruled on other grounds, Village of Los Ranchos De Albuquerque v. Marsh*, 956 F.2d 970 (10th Cir.1992)). That prior case further explained:

> the [MLA] statute of limitations at issue here applies only to actions contesting either the lease issuance or substantive decisions relating to the lease itself. It applies

in cases challenging lack of compliance with all the intricate requirements of Subchapter IV of the [MLA] which deals with oil and gas leasing. The [action which the court found not to be controlled by section 226–2] is not one "contesting decisions of the Secretary of the Interior *under the Mineral Leasing Act.*"

*Park County Resource Council v. United States Dep't of Agric.*, 817 F.2d at 616 (emphasis in original).

In the instant action, plaintiffs contest decisions of the Secretary of the Interior under the Mineral Leasing Act. The Moncriefs' leases required them to make royalty payments to the government based on their gas sale proceeds from the leased lands. The challenged actions of the MMS in this case are lease-based assessments of additional royalties. The MMS decision, therefore, was a substantive decision relating to federal leases, and the 90–day statute of limitations in 30 U.S.C. § 226–2 applies to plaintiffs' cause of action.[15] Therefore, the applicable statute of limitations was violated by plaintiffs' failure to timely contest the assessment of additional royalties on their El Paso and ANR settlements.

### CONCLUSION

The court determines that plaintiffs have failed to exhaust administrative remedies which are made mandatory by the DOI's applicable regulations pursuant to the Mineral Leasing Act. Therefore, plaintiffs' complaint is not reviewable in this court. Furthermore, plaintiffs' claim is time-barred by the ninety day statute of limitations established in 30 U.S.C. § 226–2. For these reasons, and as discussed above, defendant's motion to dismiss is **GRANTED.**

**IT IS SO ORDERED.**

---

15. The Moncriefs also look to substantiate their position through reference to the holding of the United States Court of Appeals for the Federal Circuit in *Acton v. United States*, 932 F.2d 1464 (Fed.Cir.1991). In that case, involving an overtime pay claim brought by federal employees, the Federal Circuit decided that courts "must use the statutory source of entitlement to [a claim] to determine the correct statute of limitations." *Id.* at 1466. The court's decision here is consistent with *Acton v. United States* because, as discussed earlier, the MLA is the statutory source of entitlement and governs the merits of plaintiffs' claims.