# DARBY ET AL. *v.* CISNEROS, SECRETARY OF HOUSING AND URBAN DEVELOPMENT, ET AL.

No. 91–2045.   Argued March 22, 1993—Decided June 21, 1993

BLACKMUN, J., delivered the opinion for a unanimous Court with respect to Parts I, II, and IV, and the opinion of the Court with respect to Part III, in which WHITE, STEVENS, O'CONNOR, KENNEDY, and SOUTER, JJ., joined.

*Steven D. Gordon* argued the cause for petitioners. With him on the briefs was *Michael H. Ditton.*

*James A. Feldman* argued the cause for respondents. With him on the brief were *Acting Solicitor General Bryson, Assistant Attorney General Gerson, Deputy Solicitor General Mahoney,* and *Anthony J. Steinmeyer.*

JUSTICE BLACKMUN delivered the opinion of the Court.*

This case presents the question whether federal courts have the authority to require that a plaintiff exhaust available administrative remedies before seeking judicial review under the Administrative Procedure Act (APA), 5 U. S. C. § 701 *et seq.,* where neither the statute nor agency rules specifically mandate exhaustion as a prerequisite to judicial review. At issue is the relationship between the judicially created doctrine of exhaustion of administrative remedies and the statutory requirements of § 10(c) of the APA.[1]

---

*THE CHIEF JUSTICE, JUSTICE SCALIA, and JUSTICE THOMAS join all but Part III of this opinion.

[1] Section 10(c), 80 Stat. 392–393, 5 U. S. C. § 704, provides:

"Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action. Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority."

We note that the statute as codified in the United States Code refers to "any form of reconsiderations," with the last word being in the plu-

## I

Petitioner R. Gordon Darby[2] is a self-employed South Carolina real estate developer who specializes in the development and management of multifamily rental projects. In the early 1980's, he began working with Lonnie Garvin, Jr., a mortgage banker, who had developed a plan to enable multifamily developers to obtain single-family mortgage insurance from respondent Department of Housing and Urban Development (HUD). Respondent Secretary of HUD (Secretary) is authorized to provide single-family mortgage insurance under § 203(b) of the National Housing Act, 48 Stat. 1249, as amended, 12 U. S. C. § 1709(b).[3] Although HUD also provides mortgage insurance for multifamily projects under § 207 of the National Housing Act, 12 U. S. C. § 1713, the greater degree of oversight and control over such projects makes it less attractive for investors than the single-family mortgage insurance option.

The principal advantage of Garvin's plan was that it promised to avoid HUD's "Rule of Seven." This rule prevented rental properties from receiving single-family mortgage insurance if the mortgagor already had financial interests in seven or more similar rental properties in the same project

---

ral. The version of § 10(c) as currently enacted, however, uses the singular "reconsideration." See this note, *supra*, at 138. We quote the text as enacted in the Statutes at Large. See *Stephan* v. *United States*, 319 U. S. 423, 426 (1943) ("[T]he Code cannot prevail over the Statutes at Large when the two are inconsistent").

[2] Petitioners include R. Gordon Darby and his affiliate companies: Darby Development Company; Darby Realty Company; Darby Management Company, Inc.; MD Investment; Parkbrook Acres Associates; and Parkbrook Developers.

[3] Although the primary purpose of the § 203(b) insurance program was to facilitate home ownership by owner-occupants, investors were permitted in the early 1980's to obtain single-family insurance under certain conditions. Private investor-owners are no longer eligible for single-family mortgage insurance. See Department of Housing and Urban Development Reform Act of 1989, § 143(b), 103 Stat. 2036.

or subdivision. See 24 CFR § 203.42(a) (1992).[4] Under Garvin's plan, a person seeking financing would use straw purchasers as mortgage insurance applicants. Once the loans were closed, the straw purchasers would transfer title back to the development company. Because no single purchaser at the time of purchase would own more than seven rental properties within the same project, the Rule of Seven appeared not to be violated. HUD employees in South Carolina apparently assured Garvin that his plan was lawful and that he thereby would avoid the limitation of the Rule of Seven.

Darby obtained financing for three separate multiunit projects, and, through Garvin's plan, Darby obtained single-family mortgage insurance from HUD. Although Darby successfully rented the units, a combination of low rents, falling interest rates, and a generally depressed rental market forced him into default in 1988. HUD became responsible for the payment of over $6.6 million in insurance claims.

HUD had become suspicious of Garvin's financing plan as far back as 1983. In 1986, HUD initiated an audit but concluded that neither Darby nor Garvin had done anything wrong or misled HUD personnel. Nevertheless, in June 1989, HUD issued a limited denial of participation (LDP) that prohibited petitioners for one year from participating in any program in South Carolina administered by respondent Assistant Secretary of Housing.[5] Two months later, the Assistant Secretary notified petitioners that HUD was also proposing to debar them from further participation in all HUD

---

[4] Prior to August 31, 1955, the Rule of Seven apparently had been the Rule of Eleven. See 24 CFR § 203.42 (1982) and 56 Fed. Reg. 27692 (1991).

[5] An LDP precludes its recipient from participating in any HUD "program," which includes "receipt of any benefit or financial assistance through grants or contractual arrangements; benefits or assistance in the form of loan guarantees or insurance; and awards of procurement contracts, notwithstanding any *quid pro quo* given and whether [HUD] gives anything in return." 24 CFR § 24.710(a)(2) (1992).

procurement contracts and in any nonprocurement transaction with any federal agency. See 24 CFR § 24.200 (1992).

Petitioners' appeals of the LDP and of the proposed debarment were consolidated, and an Administrative Law Judge (ALJ) conducted a hearing on the consolidated appeals in December 1989. The judge issued an "Initial Decision and Order" in April 1990, finding that the financing method used by petitioners was "a sham which improperly circumvented the Rule of Seven." App. to Pet. for Cert. 69a. The ALJ concluded, however, that most of the relevant facts had been disclosed to local HUD employees, that petitioners lacked criminal intent, and that Darby himself "genuinely cooperated with HUD to try [to] work out his financial dilemma and avoid foreclosure." Id., at 88a. In light of these mitigating factors, the ALJ concluded that an indefinite debarment would be punitive and that it would serve no legitimate purpose;[6] good cause existed, however, to debar petitioners for a period of 18 months.[7] Id., at 90a.

Under HUD regulations,

> "The hearing officer's determination shall be final unless, pursuant to 24 CFR part 26, the Secretary or the Secretary's designee, within 30 days of receipt of a request decides as a matter of discretion to review the finding of the hearing officer. The 30 day period for deciding whether to review a determination may be extended upon written notice of such extension by the Secretary or his designee. Any party may request such a review in writing within 15 days of receipt of the hearing officer's determination." 24 CFR § 24.314(c) (1992).

---

[6] According to HUD regulations, "[d]ebarment and suspension are serious actions which shall be used only in the public interest and for the Federal Government's protection and not for purposes of punishment." 24 CFR § 24.115(b) (1992).

[7] The ALJ calculated the 18-month debarment period from June 19, 1989, the date on which the LDP was imposed. The debarment would last until December 19, 1990.

Neither petitioners nor respondents sought further administrative review of the ALJ's "Initial Decision and Order."

On May 31, 1990, petitioners filed suit in the United States District Court for the District of South Carolina. They sought an injunction and a declaration that the administrative sanctions were imposed for purposes of punishment, in violation of HUD's own debarment regulations, and therefore were "not in accordance with law" within the meaning of § 10(e)(B)(1) of the APA, 5 U. S. C. § 706(2)(A).

Respondents moved to dismiss the complaint on the ground that petitioners, by forgoing the option to seek review by the Secretary, had failed to exhaust administrative remedies. The District Court denied respondents' motion to dismiss, reasoning that the administrative remedy was inadequate and that resort to that remedy would have been futile. App. to Pet. for Cert. 29a. In a subsequent opinion, the District Court granted petitioners' motion for summary judgment, concluding that the "imposition of debarment in this case encroached too heavily on the punitive side of the line, and for those reasons was an abuse of discretion and not in accordance with the law." *Id.*, at 19a.

The Court of Appeals for the Fourth Circuit reversed. *Darby* v. *Kemp*, 957 F. 2d 145 (1992). It recognized that neither the National Housing Act nor HUD regulations expressly mandate exhaustion of administrative remedies prior to filing suit. The court concluded, however, that the District Court had erred in denying respondents' motion to dismiss, because there was no evidence to suggest that further review would have been futile or that the Secretary would have abused his discretion by indefinitely extending the time limitations for review.

The court denied petitioners' petition for rehearing with suggestion for rehearing en banc. See App. to Pet. for Cert. 93a. In order to resolve the tension between this and the APA, as well as to settle a perceived conflict among the

Courts of Appeals,[8] we granted certiorari. 506 U. S. 952 (1992).

## II

Section 10(c) of the APA bears the caption "Actions reviewable." It provides in its first two sentences that judicial review is available for "final agency action for which there is no other adequate remedy in a court," and that "preliminary, procedural, or intermediate agency action . . . is subject to review on the review of the final agency action." The last sentence of § 10(c) reads:

> "Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration [see n. 1, *supra*], or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority." 80 Stat. 392–393, 5 U. S. C. § 704.

Petitioners argue that this provision means that a litigant seeking judicial review of a final agency action under the APA need not exhaust available administrative remedies unless such exhaustion is expressly required by statute or agency rule. According to petitioners, since § 10(c) contains an explicit exhaustion provision, federal courts are not free to require further exhaustion as a matter of judicial discretion.

---

[8] The Fourth Circuit's ruling in this case appears to be consistent with *Montgomery* v. *Rumsfeld*, 572 F. 2d 250, 253–254 (CA9 1978), and *Missouri* v. *Bowen*, 813 F. 2d 864 (CA8 1987), but is in considerable tension with *United States* v. *Consolidated Mines & Smelting Co.*, 455 F. 2d 432, 439–440 (CA9 1971); *New England Coalition on Nuclear Pollution* v. *United States Nuclear Regulatory Comm'n*, 582 F. 2d 87, 99 (CA1 1978); and *Gulf Oil Corp.* v. *United States Dept. of Energy*, 214 U. S. App. D. C. 119, 131, and n. 73, 663 F. 2d 296, 308, and n. 73 (1981).

Respondents contend that § 10(c) is concerned solely with timing, that is, when agency actions become "final," and that Congress had no intention to interfere with the courts' ability to impose conditions on the timing of their exercise of jurisdiction to review final agency actions. Respondents concede that petitioners' claim is "final" under § 10(c), for neither the National Housing Act nor applicable HUD regulations require that a litigant pursue further administrative appeals prior to seeking judicial review. However, even though nothing in § 10(c) precludes judicial review of petitioners' claim, respondents argue that federal courts remain free under the APA to impose appropriate exhaustion requirements.[9]

We have recognized that the judicial doctrine of exhaustion of administrative remedies is conceptually distinct from the doctrine of finality:

> "[T]he finality requirement is concerned with whether the initial decisionmaker has arrived at a definitive position on the issue that inflicts an actual, concrete injury; the exhaustion requirement generally refers to administrative and judicial procedures by which an injured party may seek review of an adverse decision and obtain a remedy if the decision is found to be unlawful or otherwise inappropriate." *Williamson County Regional Planning Comm'n* v. *Hamilton Bank of Johnson City,* 473 U. S. 172, 193 (1985).

Whether courts are free to impose an exhaustion requirement as a matter of judicial discretion depends, at least in part, on whether Congress has provided otherwise, for "[o]f

---

[9] Respondents also have argued that under HUD regulations, petitioners' debarment remains "inoperative" pending review by the Secretary. See 48 Fed. Reg. 43304 (1983). But this fact alone is insufficient under § 10(c) to mandate exhaustion prior to judicial review, for the agency also must require such exhaustion by rule. Respondents concede that HUD imposes no such exhaustion requirement. Brief for Respondents 31.

'paramount importance' to any exhaustion inquiry is congressional intent," *McCarthy* v. *Madigan,* 503 U. S. 140, 144 (1992), quoting *Patsy* v. *Board of Regents of Florida,* 457 U. S. 496, 501 (1982). We therefore must consider whether § 10(c), by providing the conditions under which agency action becomes "final for the purposes of" judicial review, limits the authority of courts to impose additional exhaustion requirements as a prerequisite to judicial review.

It perhaps is surprising that it has taken over 45 years since the passage of the APA for this Court definitively to address this question. Professor Davis noted in 1958 that § 10(c) had been almost completely ignored in judicial opinions, see 3 K. Davis, Administrative Law Treatise § 20.08, p. 101 (1958); he reiterated that observation 25 years later, noting that the "provision is relevant in hundreds of cases and is customarily overlooked." 4 K. Davis, Administrative Law Treatise § 26.12, pp. 468–469 (2d ed. 1983). Only a handful of opinions in the Courts of Appeals have considered the effect of § 10(c) on the general exhaustion doctrine. See n. 8, *supra.*

This Court has had occasion, however, to consider § 10(c) in other contexts. For example, in *ICC* v. *Locomotive Engineers,* 482 U. S. 270 (1987), we recognized that the plain language of § 10(c), which provides that an agency action is final "whether or not there has been presented or determined an application" for any form of reconsideration, could be read to suggest that the agency action is final regardless whether a motion for reconsideration has been filed. We noted, however, that § 10(c) "has long been construed by this and other courts merely to relieve parties from the *requirement* of petitioning for rehearing before seeking judicial review (unless, of course, specifically required to do so by statute—see, *e. g.,* 15 U. S. C. §§ 717r, 3416(a)), but not to prevent petitions for reconsideration that are actually filed from rendering the orders under reconsideration nonfinal" (emphasis in original). *Id.,* at 284–285.

In *Bowen* v. *Massachusetts*, 487 U. S. 879 (1988), we were concerned with whether relief available in the Claims Court was an "adequate remedy in a court" so as to preclude review in Federal District Court of a final agency action under the first sentence of § 10(c). We concluded that "although the primary thrust of [§ 10(c)] was to codify the exhaustion requirement," *id.*, at 903, Congress intended by that provision simply to avoid duplicating previously established special statutory procedures for review of agency actions.

While some dicta in these cases might be claimed to lend support to respondents' interpretation of § 10(c), the text of the APA leaves little doubt that petitioners are correct. Under § 10(a) of the APA, "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, *is entitled to judicial review thereof.*" 5 U. S. C. § 702 (emphasis added). Although § 10(a) provides the general right to judicial review of agency actions under the APA, § 10(c) establishes when such review is available. When an aggrieved party has exhausted all administrative remedies expressly prescribed by statute or agency rule, the agency action is "final for the purposes of this section" and therefore "subject to judicial review" under the first sentence. While federal courts may be free to apply, where appropriate, other prudential doctrines of judicial administration to limit the scope and timing of judicial review, § 10(c), by its very terms, has limited the availability of the doctrine of exhaustion of administrative remedies to that which the statute or rule clearly mandates.

The last sentence of § 10(c) refers explicitly to "any form of reconsideration" and "an appeal to superior agency authority." Congress clearly was concerned with making the exhaustion requirement unambiguous so that aggrieved parties would know precisely what administrative steps were required before judicial review would be available. If courts were able to impose additional exhaustion requirements be-

yond those provided by Congress or the agency, the last sentence of § 10(c) would make no sense. To adopt respondents' reading would transform § 10(c) from a provision designed to "'remove obstacles to judicial review of agency action,'" *Bowen* v. *Massachusetts*, 487 U. S., at 904, quoting *Shaughnessy* v. *Pedreiro*, 349 U. S. 48, 51 (1955), into a trap for unwary litigants. Section 10(c) explicitly requires exhaustion of all intra-agency appeals mandated either by statute or by agency rule; it would be inconsistent with the plain language of § 10(c) for courts to require litigants to exhaust optional appeals as well.

### III

Recourse to the legislative history of § 10(c) is unnecessary in light of the plain meaning of the statutory text. Nevertheless, we consider that history briefly because both sides have spent much of their time arguing about its implications. In its report on the APA, the Senate Judiciary Committee explained that the last sentence of § 10(c) was "designed to implement the provisions of section 8(a)." Section 8(a), now codified, as amended, as 5 U. S. C. § 557(b), provides, unless the agency requires otherwise, that an initial decision made by a hearing officer "becomes the decision of the agency without further proceedings unless there is an appeal to, or review on motion of, the agency within time provided by rule." The Judiciary Committee explained:

> "[A]n agency may permit an examiner to make the initial decision in a case, which becomes the agency's decision in the absence of an appeal to or review by the agency. If there is such review or appeal, the examiner's initial decision becomes inoperative until the agency determines the matter. For that reason this subsection [§ 10(c)] permits an agency also to require by rule that, if any party is not satisfied with the initial decision of a subordinate hearing officer, the party must first appeal to the agency (the decision meanwhile being inopera-

tive) before resorting to the courts. In no case may appeal to 'superior agency authority' be required by rule unless the administrative decision meanwhile is inoperative, because otherwise the effect of such a requirement would be to subject the party to the agency action and to repetitious administrative process without recourse. There is a fundamental inconsistency in requiring a person to continue 'exhausting' administrative processes after administrative action has become, and while it remains, effective." S. Rep. No. 752, 79th Cong., 1st Sess., 27 (1945); Administrative Procedure Act: Legislative History 1944–1946, S. Doc. No. 248, 79th Cong., 2d Sess., 213 (1946) (hereinafter Leg. Hist.).

In a statement appended to a letter dated October 19, 1945, to the Judiciary Committee, Attorney General Tom C. Clark set forth his understanding of the effect of § 10(c):

"This subsection states (subject to the provisions of section 10(a)) the acts which are reviewable under section 10. It is intended to state existing law. The last sentence makes it clear that the doctrine of exhaustion of administrative remedies with respect to finality of agency action is intended to be applied only (1) where expressly required by statute . . . or (2) where the agency's rules require that decisions by subordinate officers must be appealed to superior agency authority before the decision may be regarded as final for purposes of judicial review." *Id.*, at 44, Leg. Hist. 230.[10]

---

[10] In his manual on the APA, prepared in 1947, to which we have given some deference, see, *e. g.*, *Steadman* v. *SEC*, 450 U. S. 91, 103, n. 22 (1981); *Vermont Yankee Nuclear Power Corp.* v. *Natural Resources Defense Council, Inc.*, 435 U. S. 519, 546 (1978), Attorney General Clark reiterated the Department of Justice's view that § 10(c) "embodies the doctrine of exhaustion of administrative remedies. . . . Agency action which is finally operative and decisive is reviewable." Attorney General's Manual on the Administrative Procedure Act 103 (1947). See also H. R. Rep. No. 1980, 79th Cong., 2d Sess., 55, n. 21 (1946); Leg. Hist. 289, n. 21 (describing

Respondents place great weight on the Attorney General's statement that § 10(c) "is intended to state existing law." That law, according to respondents, "plainly permitted federal courts to require exhaustion of adequate administrative remedies." Brief for Respondents 19–20. We cannot agree with this categorical pronouncement. With respect to the exhaustion of motions for administrative reconsideration or rehearing, the trend in pre-APA cases was in the opposite direction. In *Vandalia R. Co.* v. *Public Serv. Comm'n of Ind.*, 242 U. S. 255 (1916), for example, this Court invoked the "general rule" that "one aggrieved by the rulings of such an administrative tribunal may not complain that the Constitution of the United States has been violated if he has not availed himself of the remedies prescribed by the state law for a rectification of such rulings." *Id.*, at 261. The state law provided only that the Railroad Commission had the authority to grant a rehearing; it did not require that a rehearing be sought. Nevertheless, "since the record shows that plaintiff in error and its associates were accorded a rehearing upon the very question of modification, but abandoned it, nothing more need be said upon that point." *Ibid.*

Seven years later, in *Prendergast* v. *New York Telephone Co.*, 262 U. S. 43, 48 (1923), without even mentioning the *Vandalia* case, the Court stated:

"It was not necessary that the Company should apply to the Commission for a rehearing before resorting to the court. While under the Public Service Commission Law any person interested in an order of the Commission has the right to apply for a rehearing, the Commission is not required to grant such rehearing unless in its judgment sufficient reasons therefor appear . . . . As the law does not require an application for a rehearing

---

agency's authority to adopt rules requiring a party to take a timely appeal to the agency prior to seeking judicial review as "an application of the time-honored doctrine of exhaustion of administrative remedies").

to be made and its granting is entirely within the discretion of the Commission, we see no reason for requiring it to be made as a condition precedent to the bringing of a suit to enjoin the enforcement of the order."

Accord, *Banton* v. *Belt Line R. Corp.*, 268 U. S. 413, 416–417 (1925) ("No application to the commission for relief was required by the state law. None was necessary as a condition precedent to the suit").

Shortly before Congress adopted the APA, the Court, in *Levers* v. *Anderson*, 326 U. S. 219 (1945), held that where a federal statute provides that a district supervisor of the Alcohol Tax Unit of the Bureau of Internal Revenue "*may* hear the application" for a rehearing of an order denying certain liquor permits, such an application was not a prerequisite to judicial review. Nothing "persuades us that the 'may' means must, or that the Supervisors were required to hear oral argument." *Id.*, at 223 (emphasis added). Despite the fact that the regulations permitted a stay pending the motion for reconsideration, the Court concluded that "the motion is in its effect so much like the normal, formal type of motion for rehearing that we cannot read into the Act an intention to make it a prerequisite to the judicial review specifically provided by Congress." *Id.*, at 224.

Respondents in effect concede that the trend in the law prior to the enactment of the APA was to require exhaustion of motions for administrative reconsideration or rehearing only when explicitly mandated by statute. Respondents argue, however, that the law governing the exhaustion of administrative *appeals* prior to the APA was significantly different from § 10(c) as petitioners would have us interpret it. Brief for Respondents 23. Respondents rely on *United States* v. *Sing Tuck*, 194 U. S. 161 (1904), in which the Court considered whether, under the relevant statute, an aggrieved party had to appeal an adverse decision by the Inspector of Immigration to the Secretary of Commerce and Labor before

judicial review would be available.[11]  It recognized that the relevant statute "points out a mode of procedure which must be followed before there can be a resort to the courts," *id.*, at 167, and that a party must go through "the preliminary sifting process provided by the statutes," *id.*, at 170.  Accord, *Chicago, M., St. P. & P. R. Co.* v. *Risty*, 276 U. S. 567, 574–575 (1928).[12]

Nothing in this pre-APA history, however, supports respondents' argument that initial decisions that were "final" for purposes of judicial review were nonetheless unreviewable unless and until an administrative appeal was taken. The pre-APA cases concerning judicial review of federal agency action stand for the simple proposition that, until an administrative appeal was taken, the agency action was unreviewable because it was not yet "final."  This is hardly surprising, given the fact that few, if any, administrative agencies authorized hearing officers to make final agency decisions prior to the enactment of the APA.  See Federal Administrative Law Developments—1971, 1972 Duke L. J. 115, 295, n. 22 ("[P]rior to the passage of the APA, the existing agencies ordinarily lacked the authority to make binding de-

---

[11] The Act of August 18, 1894, 28 Stat. 390, provided: "In every case where an alien is excluded from admission into the United States under any law or treaty now existing or hereafter made, the decision of the appropriate immigration or customs officers, if adverse to the admission of such alien, shall be final, unless reversed on appeal to the Secretary of [Commerce and Labor]."

[12] In an address to the American Bar Association in 1940, Dean Stason of the University of Michigan Law School summarized the law on exhaustion of administrative appeals: "In the event that a statute setting up an administrative tribunal also creates one or more appellate administrative tribunals, it is almost invariably held that a party who is aggrieved by action of the initial agency must first seek relief by recourse to the appellate agency or agencies."  Stason, Timing of Judicial Redress from Erroneous Administrative Action, 25 Minn. L. Rev. 560, 570 (1941).  See also 4 K. Davis, Administrative Law Treatise § 26.12, p. 469 (2d ed. 1983) ("The pre-1946 law was established that an appeal to higher administrative authorities was a prerequisite to judicial review").

terminations at a level below that of the agency board or commission, so that section 10(c) would be expected to affect the exhaustion doctrine in only a very limited number of instances").

The purpose of § 10(c) was to permit agencies to require an appeal to "superior agency authority" before an examiner's initial decision became final. This was necessary because, under § 8(a), initial decisions could become final agency decisions in the absence of an agency appeal. See 5 U. S. C. § 557(b). Agencies may avoid the finality of an initial decision, first, by adopting a rule that an agency appeal be taken before judicial review is available, and, second, by providing that the initial decision would be "inoperative" pending appeal. Otherwise, the initial decision becomes final and the aggrieved party is entitled to judicial review.

Respondents also purport to find support for their view in the text and legislative history of the 1976 amendments of the APA. After eliminating the defense of sovereign immunity in APA cases, Congress provided: "Nothing herein . . . affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground," Pub. L. 94–574, § 1, 90 Stat. 2721 (codified as 5 U. S. C. § 702). According to respondents, Congress intended by this proviso to ensure that the judicial doctrine of exhaustion of administrative remedies would continue to apply under the APA to permit federal courts to refuse to review agency actions that were nonetheless final under § 10(c). See S. Rep. No. 94–996, p. 11 (1976) (among the limitations on judicial review that remained unaffected by the 1976 amendments was the "failure to exhaust administrative remedies").[13]

---

[13] Respondents also rely on then-Assistant Attorney General Scalia's letter to the Chairman of the Senate Subcommittee on Administrative Practice and Procedure where he wrote that the Department of Justice supported the amendment in large part because it expected that many (or most) of the cases disposed of on the basis of sovereign immunity could

Putting to one side the obvious problems with relying on postenactment legislative history, see, *e. g., United States* v. *Texas,* 507 U. S. 529, 535, n. 4 (1993); *Pension Benefit Guaranty Corporation* v. *LTV Corp.,* 496 U. S. 633, 650 (1990), the proviso was added in 1976 simply to make clear that "[a]ll other than the law of sovereign immunity remain unchanged," S. Rep. No. 94–996, at 11. The elimination of the defense of sovereign immunity did not affect any other limitation on judicial review that would otherwise apply under the APA. As already discussed, the exhaustion doctrine continues to exist under the APA to the extent that it is required by statute or by agency rule as a prerequisite to judicial review. Therefore, there is nothing inconsistent between the 1976 amendments to the APA and our reading of § 10(c).

## IV

We noted just last Term in a non-APA case that

> "appropriate deference to Congress' power to prescribe the basic procedural scheme under which a claim may be heard in a federal court requires fashioning of exhaustion principles in a manner consistent with congressional intent and any applicable statutory scheme." *McCarthy* v. *Madigan,* 503 U. S., at 144.

Appropriate deference in this case requires the recognition that, with respect to actions brought under the APA, Congress effectively codified the doctrine of exhaustion of administrative remedies in § 10(c). Of course, the exhaustion

---

have been decided the same way on other legal grounds such as the failure to exhaust administrative remedies. S. Rep. No. 94–996, pp. 25–26 (1976). See also 1 Recommendations and Reports of the Administrative Conference of the United States 222 (1968–1970) (urging Congress to adopt the very language that was eventually incorporated verbatim into the 1976 amendment so that "the abolition of sovereign immunity will not result in undue judicial interference with governmental operations or a flood of burdensome litigation").

doctrine continues to apply as a matter of judicial discretion in cases not governed by the APA. But where the APA applies, an appeal to "superior agency authority" is a prerequisite to judicial review *only* when expressly required by statute or when an agency rule requires appeal before review and the administrative action is made inoperative pending that review. Courts are not free to impose an exhaustion requirement as a rule of judicial administration where the agency action has already become "final" under § 10(c).

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*