# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued April 7, 2009          Decided June 9, 2009

No. 07-1369

CSX TRANSPORTATION, INC., ET AL.,
PETITIONERS

v.

SURFACE TRANSPORTATION BOARD AND UNITED STATES OF
AMERICA,
RESPONDENTS

AMERICAN CHEMISTRY COUNCIL, ET AL.,
INTERVENORS

———

Consolidated with 07-1370, 07-1371, 07-1372, 07-1410,
08-1194

———

On Petitions for Review of an Order
of the Surface Transportation Board

———

*G. Paul Moates* argued the cause for Railroad Petitioners. With him on the briefs were *Paul A. Hemmersbaugh*, *Peter J. Shudtz*, *Paul R. Hitchcock*, *Louis P. Warchot*, *George A. Aspatore*, *J Michael Hemmer*, *Louise A. Rinn*, *Samuel M. Sipe Jr.*, *Anthony J. LaRocca*, *Terence M. Hynes*, and *Michael L. Rosenthal*.

*Nicholas J. DiMichael* argued the cause for petitioners The National Industrial Transportation League, et al. With him on the briefs were *Jeffrey O. Moreno*, *Andrew P. Goldstein*, and *John M. Cutler, Jr.*

*Raymond A. Atkins*, Associate General Counsel, Surface Transportation Board, argued the cause for respondents. With him on the brief were *Robert B. Nicholson* and *John P. Fonte*, Attorneys, U.S. Department of Justice, and *Ellen D. Hanson*, General Counsel, Surface Transportation Board. *Anika S. Cooper*, Attorney, entered an appearance.

*G. Paul Moates*, *Paul A. Hemmersbaugh*, *Peter J. Shudtz*, *Paul R. Hitchcock*, *Louis P. Warchot*, *George A. Aspartore*, *J. Michael Hemmer*, *Louise A. Rinn*, *Samuel M. Sipe, Jr.*, *Anthony J. LaRocca*, *Terence M. Hynes*, and *Michael L. Rosenthal* were on the brief of Railroad Intervenors.

*Nicholas J. DiMichael*, *Jeffrey O. Moreno*, *Andrew P. Goldstein*, and *John M. Cutler, Jr.* were on the brief for Shipper Intervenors.

Before: ROGERS, TATEL, and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: In this case we consider a set of challenges to a Surface Transportation Board regulation establishing a simplified method for resolving rail rate disputes too small to bring under ordinary procedures. The Board's new regulation gives shippers—the complainants in rail rate disputes—a choice between using the usual procedures or either of two cheaper and simpler "small claims" alternatives better suited to uncomplicated cases.

Under each alternative, relief is capped due to the method's lower accuracy. A group of railroads challenges the Board's adoption of one of the alternative methods, and a group of shippers challenges the other, as well as the relief caps on both. Finding the Board's balancing of the competing interests in accuracy and simplicity well within its statutory authority and neither arbitrary nor capricious, we deny the petitions for review in all respects.

## I.

The Surface Transportation Board regulates the rates railroads charge shippers over which they have market dominance. 49 U.S.C. §§ 10501, 10701(d)(1). Because such captive shippers are unable to fend for themselves in the market, Congress allows them to challenge a rail rate as unjust or unreasonable before the Board, *id.* § 10707(b)–(c), which can impose retrospective relief in the form of reparations, *id.* § 11704(b), and prospective relief by prescribing a new rate, *id.* § 10704(a)(1). To understand this case, a brief whistle-stop tour through the history of the Board's procedures for resolving these rate disputes is in order. All aboard!

In 1985, the Interstate Commerce Commission, the Board's predecessor, decided to resolve rate disputes under "constrained market pricing" (CMP) principles, under which the Commission would find reasonable a rate that (1) reflects the amount a captive shipper would have to pay to receive efficient service, (2) affords the railroad adequate revenues, and (3) does so without cross-subsidizing any service or facility from which the shipper receives no benefit. *Coal Rate Guidelines, Nationwide*, 1 I.C.C.2d 520, 523–24 (1985), *aff'd sub nom. Consol. Rail Corp. v. United States*, 812 F.2d 1444 (3d Cir. 1987). Under these principles, shippers able to demonstrate that the railroad has market dominance had the

choice of one of several methods to prove that the challenged rates were unreasonable. They could opt to examine the railroad's entire network for revenue adequacy or management efficiency, or alternatively, they could choose to examine only a subset of the network using the "stand-alone cost" (SAC) test—the choice of most shippers.

A SAC presentation simulates a "stand-alone railroad," a fully efficient hypothetical competitor railroad that serves the complaining shipper and other traffic sharing common facilities. *BNSF Ry. Co. v. STB* ("*BNSF I*"), 453 F.3d 473, 477 (D.C. Cir. 2006). A challenged rail rate is unreasonable to the extent it exceeds the costs (including a reasonable profit) of running the stand-alone railroad. *Id.* A SAC presentation thus furthers CMP principles by promoting efficiency and eliminating cross-subsidization. It accomplishes the former by forcing the railroad to bear the cost of any inefficiencies, and the latter by preventing the shipper from paying for any facilities from which it receives no benefit. Due largely to the difficulty of modeling an efficient stand-alone railroad, however, this process is both expensive and time-consuming—each "full SAC" case can cost a shipper up to $5 million to litigate. *Simplified Standards for Rail Rate Cases* ("*Decision*"), STB Ex Parte No. 646 (Sub-No. 1), at 31 (served Sept. 5, 2007). In fact, coal companies are virtually the only shippers who deliver sufficiently large loads along fixed routes to justify using full SAC procedures. *See Rate Guidelines—Non-Coal Proceedings* ("*1996 Guidelines*"), 1 S.T.B. 1004, 1008 n.7 (1996) (noting "prevalence" of coal rate challenges).

Recognizing the expense of full SAC cases, the Commission soon began searching for a simplified alternative. Throughout the 1980s and early 1990s, it considered but ultimately discarded several alternatives. One

proposal, intended to create a simplified SAC procedure, came in the form of a computerized model from the Association of American Railroads (AAR). Because the AAR refused to provide the proprietary source code for its computer program (known as AAR-SSAC), the Commission ran sample cases through the program to test it. AAR-SSAC's days were numbered when it labeled reasonable a rate set at 5000 percent of the railroad's variable costs.

By 1995, when Congress replaced the Commission with the Board, the Commission still had not settled on a simplified alternative. As a result, when Congress passed the ICC Termination Act of 1995, it gave the newly-created Board a year to "establish a simplified and expedited method for determining the reasonableness of challenged rail rates in those cases in which a full stand-alone cost presentation is too costly, given the value of the case." Pub. L. No. 104-88, § 102(a), 109 Stat. 803, 810 (1995) (codified as amended at § 10701(d)(3)). Responding to this directive, the Board issued a set of simplified guidelines, which rejected AAR-SSAC and introduced a "three benchmark" system, *1996 Guidelines*, 1 S.T.B. at 1041, whereby the reasonableness of a challenged rate was assessed not by simulating any alternative railroad, but simply—at least as "the starting point for a rate reasonableness analysis"—by comparing it to similar existing rates, *id.* at 1022. When this approach went unused for years, the Board held hearings to find out why. During those proceedings, shippers testified that the three benchmark guidelines were too vague and that the question of whether a case was even eligible for resolution under the three benchmark system was so uncertain as to require litigation. *Simplified Standards for Rail Rate Cases* ("*NPRM*"), STB Ex Parte No. 646 (Sub-No. 1), at 3 (served July 28, 2006) (notice of proposed rulemaking).

In 2006, the Board issued a notice of proposed rulemaking, proposing (1) the retention of a slightly modified three benchmark system for the smallest cases, (2) the creation of a simplified SAC procedure more complicated than the three benchmark system but simpler than full SAC, for use in medium-size cases, and (3) clear eligibility thresholds for each procedure. *Id.* After reviewing comments submitted by railroads and shippers, the Board in 2007 issued its final rule—the rule challenged here—which gave the shippers the choice of a modified three benchmark system intended for the smallest cases, a new simplified SAC procedure intended for medium-size cases, or full SAC. *Decision* at 5–6. Absent from the final rule are the eligibility thresholds and with them the prospect of litigation over which method to use. Instead, the new rule allows each shipper to elect the three benchmark method, simplified SAC, or full SAC for any case. To channel larger cases to the more accurate methods, the rule limits the relief available to $1 million over five years for a three benchmark case and $5 million over five years for a simplified SAC case. *Id.* at 5; *see also id.* at 27–28. This limit applies to whatever combination of retrospective and prospective relief the Board imposes. *Id.* at 28.

The three benchmark system compares the challenged rate to three benchmark figures, each expressed as a relationship between revenues and variable costs, *id.* at 10, i.e., "those costs that increase as traffic over the railroad increases," *BNSF Ry. Co. v. STB* ("*BNSF II*"), 526 F.3d 770, 773 (D.C. Cir. 2008). Calculating one of these benchmarks involves comparing the rail movement at issue with a group of similar movements. The Board selects a comparison group from groups proposed by the parties, who choose the comparison movements from the four most recent years of data in the "Waybill Sample." *Decision* at 18. That sample,

compiled by the Board, is a survey of information from rail movements across the nation. *Id.* at 78.

The Board's simplified SAC procedure is similar to the full SAC method, but with a crucial difference. In a full SAC presentation, the stand-alone railroad is hypothetical and fully efficient. In a simplified SAC presentation, the stand-alone railroad is instead a portion of the actual railroad with limited modifications not relevant here. *Id.* at 15–16.

This case involves two sets of challenges to the Board's rule. A group of shippers argues that the Board set the relief caps too low and adopted simplified SAC with neither justification nor testing. Several railroads challenge the Board's adoption of the three benchmark method, claiming that the Board sanctioned the use of stale data and barred railroads from presenting certain types of evidence in those cases. All railroad petitioners intervene to oppose the shippers' petition, and most shipper petitioners intervene in opposition to the railroads' petition. We review the Board's orders using the Administrative Procedure Act's standards, under which we will set aside agency action that is "'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *BNSF II*, 526 F.3d at 774 (quoting 5 U.S.C. § 706(2)(A)). "In the rate-making area, our review is particularly deferential, as the Board is the expert body Congress has designated to weigh the many factors at issue when assessing whether a rate is just and reasonable." *Id.*

## II.

We begin with the shippers' claims. They argue that the Board acted arbitrarily in setting the relief cap levels and in adopting simplified SAC.

*Relief Caps*

The shippers bring an intriguing but ultimately unavailing challenge to the Board's decision to set the relief limits at $1 million under the three benchmark method and $5 million under simplified SAC. Although embracing the overall approach of setting relief caps, the shippers claim that the Board failed to make the findings necessary to ensure it complied with section 10701(d)(3)'s requirement that it "establish a simplified and expedited method for determining the reasonableness of challenged rail rates in those cases in which a full stand-alone cost presentation is too costly, given the value of the case." According to the shippers, the Board failed to find that in those cases in which full SAC is too costly, the relief caps still allow simplified SAC to generate reasonable rates. Similarly, they claim that the Board failed to assure that in those cases in which *simplified* SAC is too costly, the relief caps still allow the three benchmark method to generate reasonable rates.

The shippers start from the premise that at some point a limit on relief might be so low as to produce an unreasonable rate, either by making it infeasible to bring a case or by falling too far below the rate to which the shipper would otherwise be entitled. This premise follows from the shippers' belief that any rate the Board prescribes as relief "must be reasonable" under section 10701(d)(1). *See* Shippers' Opening Br. 12. If unduly low relief caps produce an unreasonable rate in a case in which full SAC is too costly, the shippers continue, then the shipper is left without a meaningful way to get a reasonable rate. If too many cases fall into this category—that is, if too many cases in which full SAC is too costly are also cases in which simplified SAC fails to produce a reasonable rate—then, they conclude, simplified SAC would not constitute "a simplified and expedited method for determining the reasonableness of challenged rail rates in

those cases in which a full stand-alone cost presentation is too costly, given the value of the case." § 10701(d)(3).

Thus, according to the shippers, the Board should have identified that subset of cases in which full SAC is too costly and ensured that in such cases simplified SAC produces reasonable rates. They take no issue with the Board's estimate that full SAC cases cost $5 million to litigate. But according to them, the Board should have determined the minimum permissible potential recovery ratio—i.e., the ratio of available relief to litigation cost, a ratio the shippers confusingly call a "risk factor"—below which full SAC becomes too costly, and then ensured that for cases falling under the threshold produced by that ratio, simplified SAC provides enough relief to produce a reasonable rate. Shippers' Opening Br. 20–21. For example, suppose the Board had picked a potential recovery ratio of 3.0. Multiplying that ratio by full SAC's $5 million litigation cost would indicate that cases with anticipated relief of $15 million or less are those "in which a full [SAC] presentation is too costly, given the value of the case," § 10701(d)(3). After picking that ratio the Board would then have to set the simplified SAC relief caps high enough that, in cases with anticipated relief of less than $15 million, the rate produced by simplified SAC would still be reasonable. The shippers insist that the Board did none of this, but we think they ask too much.

Section 10701(d)(1) requires that a rate "must be reasonable" only if established by a rail carrier with market dominance, not if prescribed by the Board. § 10701(d)(1) ("If . . . a rail carrier has market dominance over the transportation to which a particular rate applies, the rate established *by such carrier* for such transportation must be reasonable." (emphasis added)). Therefore, contrary to what the shippers

believe, unlike railroad-set rates, the rates the Board prescribes as relief in simplified SAC cases, though subject to different requirements, need not themselves be "reasonable" within the meaning of section 10701(d)(1). *Compare* § 10704(a)(2) (requiring revenue adequacy for rates prescribed by the Board) *with* § 10701(d)(2) (requiring revenue adequacy and setting out criteria for the Board to consider in "determining whether a rate *established by a rail carrier* is reasonable for purposes of [section 10701(d)(1)]" (emphasis added)). That said, section 10701(d)(3)'s requirement of a "simplified and expedited method for determining the reasonableness of challenged rail rates in those cases in which a full stand-alone cost presentation is too costly, given the value of the case," clearly contemplates a method that may substitute for a full SAC proceeding in low-value cases—that is, a method for determining the reasonableness of rail rates not in the abstract, but for the purpose of awarding some relief to shippers. Thus, section 10701(d)(3) requires the "simplified and expedited method" to function as a meaningfully effective way to seek some degree of redress for unreasonable rail rates, and so excessively stingy relief caps could in theory render a method ineffective. In that sense, then, the shippers are correct: the Board was obliged to determine that the relief caps were sufficiently high to satisfy section 10701(d)(3).

Although not using the methodology the shippers urge, the Board did just that: it clearly recognized its section 10701(d)(3) obligation and made the necessary findings. It made clear that it understood the shippers' precise concerns, describing them as complaining of a "Hobson's choice" for certain case values and focusing on a hypothetical where a shipper who, pursuing relief under the simpler method, would "relinquish over half the value of its case," while under the more complex method would stand to make only twice the

litigation costs. *Simplified Standards for Rail Rate Cases* ("*Rehearing Decision*"), STB Ex Parte No. 646 (Sub-No. 1), at 7 (served Mar. 19, 2008). Though the precise example the Board mentioned compared the three benchmark method to simplified SAC, rather than simplified SAC to full SAC, it discussed both cases together, and its reasoning applies equally to the comparison between simplified SAC and full SAC.

After correctly identifying the shippers' concerns, the Board addressed them. It began by stating that cases which might net the same relief have different prospects for success and explained the desirability of encouraging a shipper who was "more confident of its prospects for obtaining greater relief" to use the more precise (and more costly) methods. *Id.* at 8. Next, the Board stated that according to the table of case values and net relief submitted by the shippers, "the $1 million and $5 million limits provide every shipper with a potential case with sufficient net relief after litigation costs to justify bringing a complaint under Three-Benchmark or Simplified-SAC method[s]." *Id.* The Board accordingly found that "every complainant will have a vehicle to pursue its complaint regardless of the value of the case." *Id.* That is, the Board found that shippers subject to the relief caps retain a sufficient amount of relief, even after the cost of litigation, to make it feasible to bring their cases.

The shippers insist that a too-low relief cap could violate section 10701(d)(3) in another way: even if not too close to the litigation cost of the case, a relief cap might be too far below the actual amount to which the shipper is entitled, thus requiring the shipper to forgo such an unreasonably large amount of relief as to prevent simplified SAC from serving as an effective "simplified and expedited method." Perhaps so, but the Board addressed this possibility. It acknowledged that

wherever relief caps might be set, some shippers would face a difficult choice due to the effect of the cap. *Id.* The Board then concluded:

> Ultimately, we do not think it is improper for there to be some trade-off involved in using a simpler, faster, and less costly method that is inherently less precise. We believe the limits we have set strike the appropriate balance so that we do not open the door to excessive litigation under methods that are not justified for the amount at dispute.

*Id.* This discussion clearly represents the Board's assessment that the "trade-off" does not require shippers to forgo too much relief in order to get the benefit of a simpler proceeding. The Board thus fully responded to the shippers' concern.

To be sure, the Board's analysis was qualitative instead of quantitative, but it rested on the Board's expertise, as well as an assessment of the relief cap levels. Not every problem is appropriate for qualitative analysis, but this one is: the interest in channeling larger disputes into more accurate forums is "inherently incommensurable" with the interest in giving shippers meaningful access to a simpler forum, such that there is no way to balance the two without making a "judgment call," *BNSF II*, 526 F.3d at 776 (upholding the Board's refusal to adopt certain rate adjustments). Even had the Board explicitly considered a wider range of cases, at the end of the day it would still have had to make a policy judgment as to when full SAC is "too costly" and when a relief cap renders the rate produced by simplified SAC unreasonable. *Cf. FCC v. Fox Television Stations, Inc.*, 129 S. Ct. 1800, 1813 (2009) ("It is one thing to set aside agency action under the Administrative Procedure Act because of

failure to adduce empirical data that can readily be obtained. It is something else to insist upon obtaining the unobtainable." (citation omitted)). Given this reality, we have no difficulty concluding that the Board explained itself adequately for us to "reasonably discern" its path as to the relief caps under both the three benchmark method and simplified SAC. *ACS of Anchorage, Inc. v. FCC*, 290 F.3d 403, 408 (D.C. Cir. 2002).

Hinting at an additional challenge to the Board's rule, the shippers argue in a single sentence in their opening brief that the relief caps are in fact too low to comply with section 10701(d)(3) or the general requirement that rates charged to captive shippers "must be reasonable," § 10701(d)(1). Shippers' Opening Br. 12. Yet the shippers make no attempt to demonstrate this. They never pick a certain amount or percentage of relief forgone by relief caps and claim that such an amount renders the resulting rate unreasonable. Nor do they pick a particular potential recovery ratio and claim that cases falling under that ratio are necessarily those for which full SAC is too costly. They argue only that the Board arbitrarily *failed to find* that simplified SAC would provide a reasonable rate in cases in which full SAC was too costly, not that the Board's findings on that point represent an unreasonable interpretation of the statute. Even assuming they have adequately raised the latter argument, the shippers have failed to convince us of its merit.

True, as the shippers point out, at some case values neither full SAC nor simplified SAC affords much relief. For example, under full SAC a case with total relief of $7.5 million would net only $2.5 million. This modest recovery, just half of the $5 million litigation costs, makes bringing the case under full SAC a risky venture. Under simplified SAC the case would net $4 million ($5 million capped relief minus $1 million litigation costs), but the relief cap would require

the shipper to *forgo* $2.5 million, a substantial sum equal to more than half of the shipper's net relief. Even so, that hardly means the Board erred in finding simplified SAC to be a "simplified and expedited method of determining the reasonableness of challenged rail rates in those cases in which a full stand-alone cost presentation is too costly, given the value of the case," § 10701(d)(3). In light of the obvious ambiguity inherent in this statutory language, we must uphold the Board's interpretation unless it is unreasonable. *See Ass'n of Am. R.Rs. v. STB*, 237 F.3d 676, 680 (D.C. Cir. 2001) (citing *Chevron U.S.A. v. Natural Res. Def. Council*, 467 U.S. 837, 843 (1984)). It isn't. For one thing, as the Board points out, the $4 million recovery under simplified SAC is more valuable than would be the same amount obtained under full SAC. After all, it comes more quickly and, thanks to reduced litigation costs, with less downside risk, unquantifiable yet real benefits to expedited procedures. Respt.'s Br. 46. For another, as discussed above, the prescribed rate the Board imposes—that is, the relief limited by the cap—isn't itself a rate that must qualify as reasonable under section 10701(d)(1). Far from limiting the reasonableness of a rate, the relief cap represents a procedural mechanism necessary to the reliable adjudication of a challenged rate's reasonableness. The very phrase "simplified and expedited method" contemplates that the method will impose some costs. And the costs imposed by the simplified SAC relief cap are unlikely ever to exceed the litigation costs of full SAC; because any case worth more than $9 million will yield more potential profit under full SAC, simplified SAC's relief cap will presumably cause shippers to forfeit only $4 million, less than the $5 million cost to litigate full SAC. Perhaps the Board should treat relief caps differently than other procedural mechanisms which impose litigation costs, but the shippers make no such argument. We are thus unpersuaded

by their cursory suggestion that the Board's interpretation of section 10701(d)(3) is unreasonable.

Extending this argument to the choice between simplified SAC and the three benchmark method, the shippers claim that section 10701(d)(3) obligates the Board to identify the case value at which simplified SAC is too costly and to ensure that in those cases the three benchmark procedure produces reasonable rates. We disagree. Although the statute requires the Board to devise "a simplified and expedited method for determining the reasonableness of challenged rail rates in those cases in which a full stand-alone cost presentation [i.e., full SAC] is too costly, given the value of the case," § 10701(d)(3), it nowhere requires the Board to provide any procedure for those cases in which a simplified SAC presentation is too costly. So long as simplified SAC qualifies as a "simplified and expedited method," nothing in the statute requires the Board to promulgate the three benchmark method at all. True, some cases will be too small to bring under simplified SAC, which costs an average of $1 million, but that's fully consistent with simplified SAC qualifying as a "simplified and expedited method." Under any procedure, some cases will always be too small to be worth bringing.

That said, having decided that it needed to implement a three benchmark system, the Board had to do so nonarbitrarily. *See, e.g.*, *Eagle Broad. Group v. FCC*, 563 F.3d 543, 551 (D.C. Cir. 2009). We are convinced it did. The Board analyzed the effect of the three benchmark relief caps together with that of the simplified SAC relief caps. Its findings that the relief caps "strike the appropriate balance" and afford "sufficient net relief after litigation costs," *Rehearing Decision* at 8, apply to the three benchmark caps as well as to the simplified SAC caps. For reasons similar to

those discussed above, these findings amply justify the Board's promulgation of the three benchmark caps.

*Simplified SAC*

In addition to challenging the relief caps, the shippers object to the Board's adoption of simplified SAC itself. They claim that the Board's decision not to require the simplified SAC stand-alone railroad to be optimally efficient guts the entire rationale for adopting simplified SAC in the first place. They also claim that the Board was required to evaluate simplified SAC using test data. We disagree on both counts.

In promulgating the simplified SAC method, the Board eliminated the search for inefficiencies in the stand-alone railroad. The shippers argue that this constitutes so significant a deviation from CMP principles as to render the Board's reliance on those principles to justify simplified SAC arbitrary and capricious. But the Board explained that the efficiency inquiry is precisely what renders full SAC presentations so costly, and that in its view modern railroads suffer from too little inefficiency to justify this expense for the purpose of simplified SAC. *Decision* at 55–56. Specifically, while acknowledging that in its 1996 rulemaking it had rejected the AAR-SSAC proposal because it failed to account for inefficiencies, the Board explained its change in position by observing that "rail capacity and traffic conditions have changed," and railroads are no longer "burdened by substantial excess capacity." *NPRM* at 14; *see also Decision* at 55–56 (referencing NPRM). Given this, the Board concluded that "railroads, in most instances, are likely operating at a sufficiently efficient level so that it would not be worth the time and considerable expense required to attempt to measure the amount of inefficiency that could be eliminated" by a more efficient stand-alone railroad. *Decision* at 56. It further noted that railroads have little

incentive to build unnecessary facilities given the market realities governing most rail rates, *NPRM* at 14, that simplified SAC allows limited modifications based on certain easy-to-detect inefficiencies, *Decision* at 56, and that in any event simplified SAC conforms more closely to CMP principles than does the three benchmark approach, *id.* at 56.

In our view, the shippers are simply second-guessing the Board's determination of how closely simplified SAC must track CMP principles—principles the Board itself chose to retain. True, simplified SAC does nothing to serve CMP's objective of eliminating inefficiencies, but it still perfectly serves CMP's other objective: eliminating cross-subsidization of facilities for which shippers see no benefit. *See id.* at 55. The Board reasonably concluded that this was enough. As we have said: "[t]he pursuit of precision in rate proceedings, as in most things in life, must at some point give way to the constraints of time and expense, and it is the agency's responsibility to mark that point." *BNSF I*, 453 F.3d at 482.

The shippers next take issue with the Board's explanation for its change in position from its 1996 rejection of the AAR-SSAC proposal. Although "[a]n agency may not . . . depart from a prior policy *sub silentio* or simply disregard rules that are still on the books," *Fox*, 129 S. Ct. at 1811, here the Board did no such thing. As we have pointed out, it adequately explained the turnabout by noting the decline in excess capacity and overall increase in railroad efficiency since the 1996 rulemaking. *See NPRM* at 14; *Decision* at 55–56. The Board's inference that excess capacity signals inefficiency, and the consequent finding that inefficiency had decreased to the point that uncovering it was no longer cost-effective, provide a sufficient explanation for jettisoning that inquiry in simplified cases. According to the shippers, in 1996 the Board treated certain capacity constraints (i.e., railroads

running at full capacity in certain situations) as indicative of inefficiency, which they think contradicts its current treatment of capacity constraints as a sign of efficiency. The simple answer to this cryptic objection is that in 1996 the Board did not treat capacity constraints as indicative of inefficiency. The only evidence the shippers cite on this point is the Board making the very different point that existing double-track infrastructure was less efficient than more modern computer-controlled single-track architecture. *1996 Guidelines*, 1 S.T.B. at 1015 n.33. But this remark has nothing at all to do with capacity constraints, so it can hardly conflict with the Board's current reasonable treatment of capacity constraints as signaling lower excess capacity and greater efficiency.

Next, the shippers complain that the Board failed to test its simplified SAC procedure with sample data. Acknowledging that nothing in the statute requires such testing, the shippers nonetheless maintain that since the Board tested AAR-SSAC and found that it produced unreliable results, the Board acted arbitrarily by failing to test its own simplified SAC proposal. For its part, the Board explained that the Commission only tested AAR-SSAC because the AAR refused to provide the source code for the program, thus preventing the Commission from learning its precise details. *Decision* at 54. And although AAR-SSAC was similar to simplified SAC in disregarding inefficiencies, it also had very significant differences, as it expanded the stand-alone railroad to include other profitable traffic and excluded certain insufficiently profitable traffic, steps absent from the Board's simplified SAC. *Compare id.* at 13 n.18 (describing AAR-SSAC method) *with id.* at 15–16 (describing the Board's simplified SAC). Given this difference between the two methods, we see nothing arbitrary about the decision to test the first but not the second, even after the first's poor showing.

## III.

This brings us to the railroad's challenges to the Board's adoption of the three benchmark system. They make four arguments, which we consider in turn.

### *Notice*

The three benchmark system involves a comparison of the challenged rates to a group of rates taken from the waybill sample. Under the Board's initial proposal, parties could propose comparison groups drawn from the most recent year of waybill sample data. Under the final rule, however, the parties could draw from the four most recent years of data. Relying on APA section 553, the railroads argue that the Board failed to provide notice that it was considering this change. *See* 5 U.S.C. § 553 (requiring agencies to give notice of proposed rules). We needn't address the merits of this argument, however, because the railroads failed to present it to the Board. As a general rule, "'courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice.'" *Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1148 (D.C. Cir. 2005) (quoting *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952)). And as we recognized in *Petroleum Communications, Inc. v. FCC*, 22 F.3d 1164 (D.C. Cir. 1994), and reaffirmed just last month in *Globalstar, Inc. v. FCC*, 564 F.3d 476 (D.C. Cir. 2009), the objection that an agency violated the APA's notice requirement is a "classic example" of an issue that should be raised before the agency. *Petroleum Commc'ns*, 22 F.3d at 1171; *see also Globalstar*, 564 F.3d at 484.

The railroads respond with two arguments. First, they claim that they had no way of objecting to any lack of notice until the Board promulgated its final rule. Fair enough, but they never dispute the fact that they could then have sought reconsideration, as did the shippers on other grounds.

Second, the railroads think that cases like *Petroleum Communications* and *Globalstar* are distinguishable because the FCC's organic statute, unlike the Board's, expressly requires petitioners to present their objections to the agency. Railroads' Reply Br. 13 n.6. But this distinction makes no difference because the FCC's statute only "codifies the judicially-created requirement of exhaustion," *Petroleum Commc'ns*, 22 F.3d at 1170, and we have described the statute as "requiring the same degree of exhaustion for the FCC as for other agencies," *Wash. Ass'n for Television & Children v. FCC*, 712 F.2d 677, 682 (D.C. Cir. 1983). Given that the railroads argue neither that their claim falls within any of the "recognized exceptions" to the issue exhaustion doctrine, *Petroleum Commc'ns*, 22 F.3d at 1170, nor that the Board was "afforded a fair opportunity to pass on the argument in question," *Globalstar*, 564 F.3d at 484 (internal quotation marks and brackets omitted), they may not raise their claim here.

The railroads insist that courts have no authority to require parties to exhaust administrative procedures where a statute imposes no such requirement. They are correct that in *Darby v. Cisneros*, 509 U.S. 137 (1993), the Supreme Court held that where no statute or regulation requires a party to pursue administrative remedies, courts are without authority to require parties to exhaust administrative procedures as a precondition of seeking judicial review. *Id.* at 144–45. But in *Darby*, the only question before the Court was whether agency action was "final" for the purposes of judicial review.

*See id.* at 143–47. Because *Darby* says nothing at all about other reasons courts might find certain claims barred, it leaves intact the general requirement that parties give the agency a chance to rule on all their objections. *See ExxonMobil Oil Corp. v. FERC*, 487 F.3d 945, 962 (D.C. Cir. 2007) ("Petitioners believe that the absence of a rehearing requirement in the [Interstate Commerce Act] means that they were not required to raise their complaints with FERC. Petitioners miss the point: Their error was not failing to seek rehearing, but rather failing to raise the issue at all." (citations omitted)). Even where, as here, presenting a claim to the agency requires seeking reconsideration, nothing in *Darby* permits parties to obtain judicial review of a claim they never gave the agency a chance to address.

## *Regulatory Lag*

The railroads argue that the Board arbitrarily failed to account for the "regulatory lag" caused by the delay inherent in using waybill sample data. Due to the time it takes the Board to gather the data, the most current waybill samples are at least one year old, and the ability to draw comparison movements from the most recent four samples compounds the problem. Citing the rapid change in rail rates over time, the railroads argue that the use of outdated samples converts the three benchmark system into a comparison between current rates and historical rates. The Board recognized the problem of regulatory lag and established a mechanism for addressing it on a case-by-case basis. Although the three benchmark procedure uses waybill sample data to run the benchmarks and determine a presumed maximum lawful rate, it gives the parties an opportunity to present evidence of "other relevant factors" to rebut the presumption of lawfulness and seek to modify the maximum allowable rate. *Decision* at 17, 21–22. The railroads insist that this mechanism is insufficient for three reasons, none of which has merit.

First, they argue that the opportunity to modify the presumed maximum lawful rate is illusory because it requires rebutting a presumption. But the Board has represented—and the railroads nowhere meaningfully dispute—that the presumption simply shifts the normal burden of persuasion to the party seeking a modification. Respt.'s Br. 29; Railroads' Reply Br. 6–7. This clearly allows the railroads a reasonable opportunity to seek a modification.

Second, the railroads complain that when they submit evidence of other relevant factors, the Board requires them to quantify the impact of the factors on the overall rate. True, this requires more of the railroads than would a rule allowing them to simply dump evidence in the Board's lap without explanation, but it hardly poses an insurmountable hurdle. Even under the railroads' preferred alternative, they would still need to present data sufficiently precise to have a quantifiable impact—the only difference is that under the Board's system this process of adjustment occurs after calculating the benchmarks, not before. The railroads offer no reason to believe that quantifying the impact of changing conditions is feasible at the outset of the benchmark analysis but impracticable as an adjustment to the result of that analysis. According to the railroads, in a recent set of cases brought under the new guidelines, the Board was unpersuaded by their proffered "other relevant factors" evidence. *E.g.*, *E.I. du Pont De Nemours & Co.*, STB No. 42099 (June 30, 2008). But whatever its propriety, the Board's decision in those cases, which we remanded to the agency unopposed, *CSX Transp., Inc. v. STB*, No. 08-1246 (D.C. Cir. Jan. 15, 2009) (remanding STB Nos. 42099, 42100, 42101), hardly impeaches the entire rule.

Third, the railroads complain that the Board forbids parties from submitting as "other relevant factors" evidence either of movement-specific adjustments to the cost estimates or of product or geographic competition. But these objections, to which we turn in the next two subsections, have no special force when applied to the regulatory lag problem. If, as we conclude in that discussion, the Board may exclude evidence of movement-specific costs or of competition generally, it may certainly exclude evidence of *change* in such costs or competition.

### *Evidence of Movement-Specific Adjustments*

The three benchmarks evaluate ratios of revenues to variable costs. Although revenues generated by a specific rail movement are easy to measure, variable costs directly associated with that movement are not. *See Adoption of the Uniform Railroad Costing System as a General Purpose Costing System for All Regulatory Costing Purposes*, 5 I.C.C.2d 894, 904 (1989) ("Given the degree of aggregation in the accounting data reported to the Commission, it is impossible for either Rail Form A or URCS [i.e., two alternative costing systems] to produce true marginal costs for particular movements . . . ."). To estimate these costs, the Board uses the Uniform Rail Costing System (URCS), a procedure that generates a statistical estimate of each railroad's variable costs based on its "system-wide average variable costs." *BNSF II*, 526 F.3d at 774. For years, the Board has used URCS to answer the threshold question whether a railroad has enough market dominance to allow the Board to regulate the rate in the first place. In that context, the Board originally allowed the parties to argue for movement-specific adjustments to the cost estimates, but recently decided to bar them, finding that "the cost savings and increase in predictability . . . outweigh any gains in accuracy from the railroads' or shippers' adjustment

proposals." *Id.* at 776. We upheld the Board's decision as a permissible exercise of its judgment. *Id.*

Here the railroads argue that although the Board could permissibly exclude movement-specific adjustments from cost estimates used in the threshold market dominance determination, it acted arbitrarily in barring them from estimates used in the three benchmark procedure. None of the railroads' three arguments for this point has merit.

First, they claim that the Board failed to address commenters' proposals to use only certain such adjustments. But the Board specifically considered and rejected these intermediate proposals, explaining that it would be unfair to allow only certain adjustments without granting the opposing party an opportunity to "submit counter-adjustments," as well as "access to broad discovery" for that purpose. *Decision* at 97.

Second, they claim that the need for accurate cost estimates is particularly acute in three benchmark cases given the methodology's inherent crudeness. The Board, however, relied on its experience with such adjustments to conclude they are too costly in light of their limited effect on accuracy. *Id.* at 84. And although crude, the three benchmark method is used for small disputes where efficiency is paramount. Further, using movement-specific adjustments in a three benchmark presentation would be even more cumbersome than in the threshold market dominance determination, as it would require calculating movement-specific adjustments for every movement in the comparison group, not just the challenged movement. Given this, the Board's conclusion that, as in the case of the threshold market dominance determination, movement-specific adjustments are too costly for three benchmark presentations, represents the "kind of

judgment call" that "balances inherently incommensurable costs and benefits" and "falls within the expertise of the agency," *BNSF II*, 526 F.3d at 776.

Third, the railroads argue that comparing movement-specific revenues with system-average costs is inherently arbitrary. But if that were true, then doing so in determining market dominance would have been equally impermissible. And in any event, there are sound reasons for the mismatch: getting movement-specific revenues is easy, whereas calculating movement-specific variable costs is difficult, and in the Board's expert judgment not much more accurate.

*Evidence of Product or Geographic Competition*

Finally, the railroads complain about the Board's preclusion of evidence of product or geographic competition. They argue that the Board never provided notice that it was considering barring such evidence, but given that the Board initially proposed barring *all* evidence offered to disturb the result of the three benchmark calculation, the Board's eventual rule barring *some* evidence represented a "logical outgrowth" of the proposal. *Ass'n of Battery Recyclers, Inc. v. EPA*, 208 F.3d 1047, 1058 (D.C. Cir. 2000) (internal quotation marks omitted); *see also id.* at 1059 ("EPA proposed allowing alternative standards for remediated soils. . . . One would logically conclude that EPA could have ended up allowing alternative standards for all soils as the proposal suggested, for no soils, or—as it turned out—for some soils.").

On the merits, the railroads argue only that the Board failed to consider the possibility that parties could present such evidence without the need for discovery. But no commenter suggested to the Board that such evidence, which the Board had previously excluded from full SAC cases due

to the discovery and other burdens it caused, *Market Dominance Determinations—Prod. & Geographic Competition*, 3 S.T.B. 937, 946–47 (1998), could be presented without discovery.  Given that, the Board hardly acted arbitrarily in failing to consider that point.

## V.

For the reasons stated above, we deny the petitions for review in their entirety.

*So ordered.*